375 So.2d 151 (1979)
Dr. Doyle P. PHILIPPE, Plaintiff-Appellee,
v.
BROWNING ARMS COMPANY et al., Defendants-Appellants.
No. 13885.
Court of Appeal of Louisiana, Second Circuit.
August 27, 1979.
Rehearing Denied October 4, 1979.
*152 Allen, Gooch & Bourgeois by Raymond Morgan Allen, Lafayette, for defendants-appellants.
Goff, Goff, Levy & Hearn by A. Kennon Goff, III, Ruston, for plaintiff-appellee.
Before BOLIN, PRICE and MARVIN, JJ.
BOLIN, Judge.
Plaintiff filed this suit to recover damages he sustained when his twelve gauge shotgun accidentally discharged and severed the thumb on his right hand. Finding a defect in the manufacture and design of the gun's safety mechanism caused plaintiff's injuries, the trial court rendered judgment for over $900,000 in his favor. Defendants appeal[1] and plaintiff answers the appeal. We amend the judgment to allow plaintiff to recover attorney fees and otherwise affirm.
The trial court wrote an excellent opinion which contains a detailed review of the facts. We take the liberty of quoting extensively from its findings:
"This is a suit brought by Dr. Doyle F. Philippe, a practicing dentist, against Browning Arms Company, the importer, and Fabrique Nationale, the manufacturer of a twelve gauge Double Automatic Shotgun sold under the name of Browning [the parent company of Browning Arms is also made a defendant] . . . Dr. Philippe is right-handed and in this litigation claims damages for the pain and suffering which he has endured, mental anguish, loss of income due to the loss of his thumb on his dominant hand which prevents his practicing dentistry, . . . and other damages [including attorney fees].
"The Browning Double Automatic Shotgun which caused the injury was purchased by Dr. Philippe in September of 1967 from Dave's Hardware in Denham Springs, Louisiana. Shortly after the purchase the fingerpiece which operates the safety fell off in Dr. Philippe's hand while he was carrying the gun on a hunting trip. This made the safety inoperative and the gun was forwarded to Browning in Missouri for repairs and/or replacement of the safety, and in due course it was repaired and returned to the plaintiff.
"The Browning Double Automatic Shotgun is an expensive weapon, and was designed as a sportsman-type weapon catering to the `carriage trade'those desiring a European sportsman-type weapon with American features. The safety on this shotgun is unique. It is not a crossbolt type safety or a safety that blocks the hammer movement, but a safety that blocks only the trigger action. It is located on the rear part of the trigger guard and consists of a cantilever spring on rollers attached to a shaft which passes through a slot in the trigger guard. On the outside of the trigger guard a fingerpiece is attached to the shaft by a pin which passes through two (2) holes in the fingerpiece and a hole in the shaft. The safety is operated by pushing down with the index or middle finger on the fingerpiece, which blocks the action of the trigger, and by pulling up on the fingerpiece with the index or middle finger which frees the block on the trigger and takes the safety off. If the pin which holds the fingerpiece on the shaft comes out the safety *153 becomes inoperative, and this is what happened in 1967 when the gun was sent to Browning for repairs or replacement. No explanation was ever given for the loss of this pin in 1967.
"On the day of the accident, February 21, 1976, Dr. Philippe had been hunting rabbits with a group of men in Franklin Parish, using this Browning Double Automatic Shotgun. They were hunting with dogs and toward the end of the hunt the dogs were barking, apparently running rabbits, some distance from the main hunting party. Dr. Philippe recalls that about twenty minutes before the accident he had shot at a rabbit using this shotgun. He definitely remembered putting the safety on after his shot. Afterwards he stood on a log listening to the dogs run and then sat down on the log, never having moved the safety from its on-safe position. He leaned the gun back against the log at something approaching a forty-five degree angle, with the trigger guard facing outward and the gun right beside him. About twenty minutes later someone in the party said it was time to go, and Dr. Philippe grasped his gun somewhere about the middle or lower part of the barrel or stock and started getting up, all in one movement, pushing with his knees and grasping the gun and lifting all at the same time. He testified that he felt a drag on the gun [presumably caused by the trigger hanging on a branch or twig] and at the same time the barrel started slipping through his hand. As his hand reached the end of the barrel the gun discharged and blew the thumb of his right hand off. The pushing to a standing position, the simultaneous lifting of the gun, the drag, the slipping of the barrel, and the discharge all happened within a split second.
"Dr. Philippe was taken to a physician and after the excitement it was discovered that the fingerpiece and pin were missing from the Browning Double Automatic Shotgun he was using. A search was made around the log where the accident took place but the hunters were unable to find the fingerpiece or the pin which held it on the shaft.

* * * * * *
"This Court commences with the premise that Dr. Philippe was an experienced and careful hunter and handler of weapons, thoroughly familiar with all the safety rules and the functioning and propensities for danger of all guns, and the further premise that neither plaintiff nor any other person had tampered with the safety or any part of the Browning Double Automatic Shotgun. . . .

* * * * * *
"The pin which holds the fingerpiece on the shaft is exposed on each end, i. e., there are no other parts covering this pin, and the pin is the most crucial part of the safety mechanism. Without the pin the safety will float and will not maintain itself in either an on-safe position or an off-safe position. This can be seen by an inspection of Dr. Philippe's gun filed in evidence, which has never had the safety retaining pin replaced.
"According to employees of Fabrique Nationale, hereinafter sometimes referred to as FN, this pin is inserted in the assembling process by `swedging' which means forcing an oversized retaining pin into the holes with a hammer or a press. The pin is slightly tapered with one small end for insertion through the holes and the other end somewhat larger. Assembling instructions of FN further call for a slight bend or bow in the pin before insertion, to be made by the employee assembling the piece. This is supposed to assure what is called an interference fit. After the small end is inserted in the holes the pin is either driven through with a drift pin and hammer or a press. This is all performed by an assembler without any gauges or other manner of making measurements, and it is purely the assembler's `feel' that determines whether the interference fit is sufficient. There were two (2) quality controllers at FN, one who inspects for FN and another who inspects for Browning, but neither of the controllers use any gauges or other instruments for determining the sufficiency of the interference fit. The controller works the mechanism *154 for a few times, and he might take a drift pin and use some pressure to see if the pin will come out, but again there is no measurement and no pressure test with instruments or pressure gauges to determine the sufficiency or the firmness of the fit. The specifications for the size of the pin and the size of the holes call for the following designated sizes:

Small end of pin: 1.49 millimeters + or -.015

Large end of the pin: 1.53 millimeters + or-.012
Size of the holes: 1.535 millimeters + or -.03
. . . With these specifications and tolerances it is possible to have a pin smaller than the hole and it it were not for the bending or bowing of the pin the fit would be loose. . . . On the undersized pins, only the bending or bowing of the pin could be relied upon to form a firm fit, and that in itself would depend upon the amount of the bow and the skill of the assembler.
"The assembler of the safety mechanism is furnished with the pins, the shaft and the fingerpiece with the holes already inserted, and the assembler simply picks up a pin from the box furnished to him and proceeds to insert same through one hole of the fingerpiece, then through the shaft and on through the hole on the other side of the fingerpiece, all parts furnished to him. The assembler makes no measurements as to size of the pin or the holes, and no evidence was submitted by FN as to quality control on those designated features. The bending or bowing of the pin, it appears, is relied upon principally to form a force fit on undersized pins. Since no gauges or instruments as to pounds of pressure are used to test the fit, only the `feel' of the assembler assures a proper fit. If the pin is forced out of the hole, of course, the fit is destroyed and the mechanism has to be re-pinned. Thus the ultimate test destroys the fit.
"Numerous experts were critical of the bowing of the pin to obtain an interference fit, most notably Mr. Walter R. Nass. . . . Colonel Edward B. Crossman, another expert in firearms, testified that the bow in the pin would not be sufficient, especially if the pin were rotated. . . . Several ways of inserting the pin were suggested which would secure a firm and infallible fit, but the best method was cited by Professor Joe Barnwell, a mechanical engineer, designer and expert in products failure analysis. His testimony and drawings . . . called for the insertion of a pin with a small overlap or head on the end, and then the spreading of the other end to form a head, which would make an immovable and permanent pin. The principal objection by FN to this procedure appeared to be the work involved if the pin ever had to be removed, but this Court feels that the pin itself was so crucial to the safety mechanism that this method or some similar method should have been adopted to obtain a permanent fit for the protection of the consumer. Especially would this seem to be indicated since no gauges, pressure gauges or instruments of any kind were used to test the security of the fit, sole reliance being placed on the `feel' of the assembler and the controller (and their skill or lack of skill) to obtain a proper fit of this most crucial part of the safety mechanism.

* * * * * *
"From the design standpoint, the safety of the Browning Double Automatic Shotgun also came in for some criticism from the experts who testified in the field of firearm design. It takes only four or five pounds of pressure to move the safety, and the up and down motion from on-safe to the off-safe position makes it much more susceptible to unintentional movement than the punching operation of the button of a crossbolt safety. It can easily be moved by twigs or a slight brush against clothing or parts of the body. Although its location is convenient for the sportsman it also serves as a trap and can unknowingly be manipulated just in carrying the gun on the shoulder or brushing against any object. Even carrying the gun in the recommended position across the chest exposes the safety to movement by briars, brushes and snags that the ordinary punch-type crossbolt safety *155 would not be exposed to. In the handling of a gun with a cross bolt safety, the safety ordinance has to be deliberately and intentionally moved, but with the safety on the Browning Double Automatic it can unknowingly and unintentionally be manipulated in numerous ways."
The court found these defects in the manufacture and design of the safety mechanism caused the accident. In reaching this conclusion, the court found the pin had fallen out sometime between the time Dr. Philippe last shot the gun and the time he sat on the log and the safety was not functioning at the time of the accident. The court also found that even if contributory negligence and assumption of the risk were defenses in cases involving a manufacturing defect, Dr. Philippe's actions constituted neither.
The court awarded Dr. Philippe $100,000 in general damages for pain and suffering, $800,000 for loss of future earnings, and $67 for medical expenses, but denied his claims for punitive damages and attorney fees.
Defendants appeal contending the trial court erred in finding the manufacture and design of the safety mechanism to have been defective. Alternatively, defendants contend the court erred in finding the defect to have been the cause of the accident and that plaintiff's contributory negligence and assumption of risk should bar his recovery. Defendants argue that, in any event, the damages awarded are excessive.
Plaintiff has answered the appeal seeking an increase in the award for loss of future earnings, and claiming that attorney fees and punitive damages should have been awarded.
Defendants' remaining specifications of error concern factual issues. Defendants contend the trial court was clearly wrong in finding a defect in the manufacture and design of the safety and in finding the safety was inoperative at the time of the accident.
As the trial court stated, the manufacturing specifications for the gun's safety were such that the pin used to secure the fingerpiece could be too small for the hole in which it is placed. When this occurs, the pin will be loose and susceptible to falling out unless it was sufficiently bowed by the assembler on installation. We agree with the trial court that reliance solely on the "fuel" of the individual assembler, without any method of testing or control, to secure the most crucial component of the safety mechanism creates an unreasonable risk of harm. This is particularly true in light of the fact that (1) the employees of FN who assembled the safeties for the guns were not skilled gunsmiths and (2) the gunsmith in charge of Browning's repair division in Missouri was not even aware the pin needed to be bowed in order to insure a proper fit. Since the pin did fall out, the only explanation is that the pin was not properly fitted. Consequently, the malfunction of the safety on plaintiff's gun was a result of a defect in both the design and the manufacture.
Defendants also contend the court was clearly wrong in finding the safety was inoperative at the time of the accident. They contend the pin fell out after the accident occurred and that the true cause of the accident was plaintiff's failure to return the safety to the "on" position after his last shot. As the trial court noted, plaintiff was an experienced hunter and was well versed in the rules of gun safety. Under these circumstances we find no error in the trial court's acceptance of plaintiff's testimony that he was sure he returned the safety to the "on" position, particularly in absence of evidence to the contrary.
We further agree with the trial court that even if contributory negligence and assumption of the risk are valid defenses in a products liability case involving a defect in design and manufacture, neither would apply to bar plaintiff's recovery. Dr. Philippe's reliance on the gun's safety to prevent an accidental and unintentional discharge was not unreasonable and we cannot find that he knowingly encountered the risk that the safety might at some time cease to function.
*156 As to the issue of damages, all parties have appealed, defendants claiming the award is excessive and plaintiff claiming it is inadequate. Much discretion is afforded the trial court in these cases and absent an abuse of discretion an appellate court should not disturb the award. Coco v. Winston Industries, 341 So.2d 332 (La.1976); Robinson v. Graves, 343 So.2d 147 (La.1977). As a guide to determining whether the trial court abused its discretion, our Supreme Court has stated:
" . . . The question is not whether a different award might have been more appropriate, but whether the award of the trial court can be reasonably supported by the evidence and justifiable inferences from the evidence before it. That such evidence might also support a greater (or smaller) award will not justify a change in the amount by the appellate court."

Bitoun v. Landry, 302 So.2d 278 (La.1974). See also Reck v. Stevens, 373 So.2d 498 (La.1979).
The trial court heard expert testimony from three economists who calculated the extent of Dr. Philippe's loss of future earnings. Although acceptance of a different combination of the factors used by each could produce a lower or higher figure than the amount awarded [$800,000], we find the trial court was well within its discretion. The award of $100,000 for general pain and suffering was likewise within the court's broad discretion.
Plaintiff, in his answer to this appeal, alleges the trial court erred in failing to award him reasonable attorney fees under Civil Code Article 2545, which provides:
The seller, who knows the vice of the thing he sells and omits to declare it, besides the restitution of price and repayment of the expenses, including reasonable attorneys' fees, is answerable to the buyer in damages.
He contends that since a manufacturer is presumed to have knowledge of the defect and since the defect in the shotgun was not declared to him, this article should apply and allow him to recover reasonable attorney fees in addition to damages for pain and suffering and loss of future earnings. Although this article is contained in the section of the Code dealing with redhibition, plaintiff claims it may be applied in cases where personal injury damages alone are sought. He reasons that since Louisiana courts employ fact pleading rather than requiring a litigant to plead the "theory of the case", he is entitled under the facts actually proven to whatever relief the law allows, and it makes no difference whether the suit is technically termed an act in redhibition or one in tort. Plaintiff argues that any time a plaintiff buyer shows he has suffered damage caused by a defect in a product manufactured by the defendant, the relief provided in article 2545 is available to him regardless of whether his petition includes a demand for the return of the purchase price of the defective product.
We agree. In Harris v. Bardwell, 373 So.2d 777 (La.App.2d Cir. 1979), this court recently stated there is no difference in "damages" as contemplated by Civil Code Article 2315 and "damages" under Article 2545. There we noted that recovery for damage caused by a defective product smacks of both contract and tort and that recovery may be had under either theory. Although these statements in that case may be dicta since the plaintiff had sought recovery under both theories, we find they are a correct statement of the law. See also Albritton v. McDonald, 363 So.2d 925 (La.App.2d Cir. 1978); Townsend v. Cleve Heyl Chevrolet Buick, Inc., 318 So.2d 618 (La.App.2d Cir. 1975); C. T. Boudreaux Lumber Co. v. Sherrwood Homes, 371 So.2d 326 (La.App.4th Cir. 1979).
We have held that article 2545 does not exclude personal injury damages which are factually and legally caused by the defective product. See Harris, supra. This permits an award of attorney fees despite the fact that plaintiff's petition does not demand rescission of the sale. Whenever plaintiff's petition alleges facts sufficient to entitle him to redhibition (defect, damage and causation), he is also entitled to recover reasonable attorney fees under article 2545 *157 regardless of whether his suit is labeled in tort or in redhibition.
The trial of this case took six days and required extensive discovery and pretrial preparation. We award $25,000 as reasonable attorney fees.
Plaintiff also alleged the trial court erred in failing to award punitive damages. He acknowledges that punitive damages, as a general rule, are not recoverable but insists that such damages are proper when necessary to prevent repetition of the conduct that caused plaintiff's injury. We find no merit in this contention since punitive damages are not recoverable absent a specific provision providing for them. Alexander v. Burroughs Corp., 359 So.2d 607 (La. 1978).
The judgment is amended to award plaintiff $25,000 attorney fees and, as amended, is affirmed at appellants' cost.
NOTES
[1] Judgment was rendered in favor of defendant Sentry Insurance Company, the liability insurer of the retail seller. That portion of the judgment has not been appealed.