A jury found appellant guilty on a trial on a complaint charging him with driving "a motor vehicle upon a public highway . . . while under the influence of intoxicating liquors or narcotic drugs." The case came to the Circuit Court by an appeal by defendant from a conviction in the Jefferson District Court (Bessemer Division). One trial in the Circuit Court resulted in a mistrial by reason of the inability of the jury to reach a verdict. In the trial now under consideration there were only two witnesses, the officer who arrested the defendant while driving the vehicle on the occasion involved and the defendant himself. The only issue of fact presented was whether defendant was under the influence of intoxicating liquor at the time. There was no semblance of any evidence that he was under the influence of drugs.
Among the issues presented on appeal, is appellant's contention that "The trial court erred in denying the defendant's motion to exclude the State's evidence based on the insufficiency of the evidence." The parties argue, in connection with said contention, questions as to the admissibility and reliability of scientific tests as to the intoxication of defendant that were made soon after his arrest. We will discuss those questions hereinafter. Meanwhile, we discuss the question of the sufficiency of the evidence, without regard to the results of the scientific tests, which appellant contends should not have been admitted in evidence and which, according to the contentions of both parties, were unfavorable to appellant on the issue as to his intoxication. According to the testimony of the arresting officer, he was on duty about 11:00 P.M., July 11, 1980, and observed the pickup truck that defendant was driving as it entered the northbound lane of I-59 headed toward Fairfield from Bessemer. It was "running between 70 and 75 miles per hour." His testimony continued in part as follows:
 "A. As I was coming up on him and started to clock him, the pickup truck and the driver occupying the pickup truck was weaving on the road, primarily staying in the inside lane. He crossed what is called a dividing line which divides the inside and outside lane and also running off into the median strip.
 "Q. All right, sir. And after you observed this vehicle run off into the median, how much longer did you observe the truck?
 "A. I observed the truck — well, we run off into the median about six-tenths of a mile from the 19th Street exit and he nearly hit the end of a bridge as approaching a bridge and running it back in and —
". . . . *Page 717 
 "A. As soon as he got into the — back into his lane, I turned the blue light on him and I followed him for some six-tenths of a mile which I measured this morning on my way to court. And during this six-tenths of a mile, he didn't stop for a blue light, I turned the siren on about half that distance, about three-tenths of a mile followed with sirens and he finally pulled over in the median strip after he crossed the exit there at 17th Avenue at the Echo Truck Stop which that truck stop was not there at that time.
 "Q. At the time — once the truck was stopped in front of you, what did you do after that?
 "A. I got out of the car and like I said, we were both stopped in the median of the highway, and I approached the car and asked the driver to step out and let me see his driver's license."
The witness identified the driver as the defendant and continued his testimony as follows:
 "Q. . . . Once this individual found his driver's license what did that individual do with his driver's license?
 "A. Well, first he dropped his driver's license and went to pick his driver's license up and he nearly fell over picking up his driver's license.
 "Q. What distance, Officer Eaton, were you from this man, this defendant when he dropped his driver's license?
"A. I was standing in the shoulder.
"Q. Within how many feet in your best judgment?
"A. Less than two feet.
 "Q. Did you have an occasion while you were some two feet from this defendant to smell any odor about him at that time that you could recognize?
 "A. Yes, sir, I smelled odor of an alcoholic beverage.
 "Q. After this individual, after this defendant picked up his driver's license and after you made this observation about this odor of alcohol, did you have any conversation about this, did you say anything else to him?
 "A. I don't recall the exact words other than to put his hands on the pickup truck, he was placed under arrest, he was staggering around some and his speech was slurred. I just turned him around and told him he was under arrest for driving under the influence and I observed him."
After lengthy testimony as to the scientific testing of defendant for alcoholic content, the direct examination of the officer was thus continued:
 "Q. Now, thinking back and based on this previous experience that you have just talked about, the several hundred people you have observed under the influence of alcohol, based on your previous experience and what you have observed from this defendant's driving, his speech, his manner of walking, balance and so forth on the night of July 11, 1980, based solely on that as to your observation, his driving, his speech, his acts, and odor of alcohol on his breath —
"MR. O'KELLY: We object to the leading.
"MR. CARTEE: Do you have an opinion, Your Honor?
"THE COURT: State your question.
 "Q. Do you have an opinion based on this previous experience as a law enforcement officer, based on that experience and your observation on July the 11th, 1980, this man, his actions, and speech and so forth and the odor about him, do you have an opinion whether or not he was under the influence of alcohol when you stopped his truck?
"A. In my opinion he was highly intoxicated."
In our opinion, the testimony of the arresting officer as narrated is of itself sufficient to present a factual issue as to the intoxication of defendant and justifies the denial of defendant's motion to exclude the evidence made at the conclusion of the State's evidence. The testimony is even stronger on the point than that which was held sufficient inPrescott v. State, 44 Ala. App. 670, 219 So.2d 655, 656 (1969), in which it is stated:
 "The only question was whether or not (1) the circumstance of Prescott's weaving *Page 718 
back and forth across the center line and berm as he drove on a road in Crenshaw County toward Coffee County, (2) the circumstances of his falling out of his car when it stopped in Coffee County and (3) a highway patrolman smelling alcohol on his breath at that latter time constituted sufficient evidence to show that the offense occurred in Crenshaw County.
 "After a careful review of the State's evidence, we consider that the jury's verdict is based upon sufficient evidence. Moreover, no point on venue was raised under Circuit Court Rule 35."
In United States v. Hughes, 542 F.2d 246 (5 Cir. 1976), Hughes, a civilian had been stopped by the Military Police of Fort Rucker, Alabama, on suspicion of driving while intoxicated. He was convicted of the charge under the Assimilative Crimes Act. The major portion of the appeal dealt with the introduction in evidence of the results of an alcohol-breath test given the appellant at the Daleville, Alabama, Police Station. The court held at 542 F.2d 249:
 "The record shows that Hughes was stopped by the Military Police after they noticed his car weave across the center line of the highway three times. Hughes stumbled when getting out of the car and the arresting officer detected the odor of alcohol on his breath. When asked to walk a straight line, Hughes stumbled and was unable to perform a balancing test in which he was asked to stand with his heals together, lean backwards, extend his arms outward and then touch his nose with his index finger. Following these occurrences, Hughes was taken to Daleville Police Station where the P.E.I. breath test was given.
 "The defense attempted to refute the Government's case with the testimony of two persons who had been with Hughes at the Colonial Lounge in Daleville, Alabama, shortly before he was stopped by the Military Police. One witness testified that Hughes did not stagger when he left the Lounge and the other testified that there was nothing about his appearance that would lead him to believe that Hughes was intoxicated. Both men testified that the appellant drank a beer, but it is unclear from the record whether the two men were talking about the same beer. The defense also points out that Officer Ramsey, who administered the P.E.I. test, said that Hughes did not stagger when he walked. On the basis of these facts, it is the opinion of this court that even in the absence of the P.E.I. results, the evidence of Hughes' intoxication was sufficient to prove his guilt beyond a reasonable doubt. The admission of the breath test evidence, therefore, must be considered harmless error, even if it was error."
A careful study of the opinion in United States v. Hughes,supra, discloses that the last sentence of the part of it quoted above, wherein it was held that the judgment of the trial court should not be reversed even if it had committed error in admitting in evidence the results of the scientific tests as to the alcoholic content of defendant's body is not applicable in the instant case. This, we conclude, for the sole reason that in the cited case there had been a non-jury trial, as distinguished from a trial by jury in the instant case, and the trial judge found "that the guilt of defendant was established beyond any reasonable doubt, without regard to the P.E.I. test." 542 F.2d p. 248. We turn now to consideration of appellant's contentions relative to the admission in evidence of the testimony for the State as to such test, which contentions appellant enumerates in his brief as Issues I, II, III and IV.
By Issue I, appellant asserts that it was error for the court "to allow the State's witness to refresh his recollection by referring to a document which was not a duplicate or an exact copy of the original." The document referred to is State's Exhibit 1, a one-page photocopy of a typed or printed document with the following caption:
 "GAS CHROMATOGRAPH INTOXIMETER-MARK IV OPERATIONAL PROCEDURE (Method of Operation)"
State's Exhibit 1 is obviously a form to be used by the operator of a Gas Chromatograph *Page 719 
Intoximeter-Mark IV, in which there are blanks for the operator to supply the name of the "subject" tested by the intoximeter, the "Date," the name of the "Testing Officer" and the "Permit No." Thereafter, there are nine numbered steps in the procedure and a small square at the front end of steps 1, 2, 3, 4, 6, 8, and 9, which is obviously for the purpose of the operator indicating by the mark of his pen or pencil therein that he has complied with the particular step of the instructions. Step 5 is followed by a blank line for the operator to show therein the "Time" of the particular operation and step 7 is followed by a blank line for the operator to show "results" immediately before the symbol "%." The instruction of step 9 is "Remove RECORDER STRIP CHART, identify and record result on log." Immediately thereafter, and finally, is lined, approximately 3" by 6", space with the instruction therein, "ATTACH STRIP CHART."
State's Exhibit 1 was not admitted in evidence. The court expressly sustained defendant's objection to it. Notwithstanding the large number of questions asked the arresting officer on direct examination and on cross-examination, there were few definite rulings invoked by defendant as to questions pertaining to references made by the witness to State's Exhibit 1, which questions were answered. As a result, a serious question arises as to whether the testimony of the witness as to which no objection was made renders harmless the asserted error, if any, in overruling defendant's objections to questions that sought by State's Exhibit 1 to refresh the recollection of the witness. Nevertheless, we forego determination of that question, for the reason, in our opinion, the witness showed by his testimony that he had personal knowledge of the contents of the printed or typed portion of State's Exhibit 1. He was only uncertain as to whether the particular document used and filled in by him, which at the time of the trial could have been found by looking through "thirty (30) boxes of material," contained thirteen steps or, on the other hand, nine steps. He did testify that, some time soon before or soon after the test as to this appellant was made by him, the form for the procedures had been changed from a thirteen-step to a nine-step procedure and that this change had been effectuated simply by deleting four of the steps of the thirteen-step form. Contrary to the insistence of appellant on the point, we think that whatever rulings were made on the point adverse to defendant are consistent with Gamble, McElroy's Alabama Evidence, § 116.02 (1) (1977), cited by appellant as follows:
 "In order to utilize a memorandum for the purpose of present recollection revived, or refreshing memory, it must appear that the witness has personal knowledge of the event recorded in the writing and that the writing is a correct record of such event."
Issues II and III as stated in appellant's brief are:
 "II. IT WAS ERROR FOR THE TRIAL JUDGE TO ALLOW ORAL TESTIMONY AS TO THE READING TAKEN FROM THE MACHINE AFTER THE DEFENDANT WAS TESTED WHEN THE BEST EVIDENCE RULE REQUIRES THAT THE PRINTED GRAPH SUBMITTED BY THE MACHINE IS THE BEST EVIDENCE OF SUCH READING.
 "III. THE TRIAL COURT ERRED IN ALLOWING THE WITNESS TO REFRESH HIS RECOLLECTION AND GIVE ORAL TESTIMONY AS TO THE READING FROM THE MACHINE BY REFERRING TO A DOCUMENT FOR WHICH NO PROPER PREDICATE HAD BEEN LAID PRIOR TO THE ADMISSION OF SUCH ORAL TESTIMONY."
Although Issues II and III are treated separately in appellant's brief, it is to be noted that each issue pertains to the admission in evidence of "oral testimony as to the reading from the machine" or "taken from the machine." We now endeavor to discuss them collectively in part, to avoid repetition, and in part separately, when the need therefor arises. *Page 720 
The "reading from the machine" evidently refers to the "digital readout" referred to in the evidence, which was observable by the operator of the machine and was graphed by the machine as a record of the percent of alcohol in the breath tested. It was shown that the actual graph had been preserved for a while, was used in court on the trial of this case in the Jefferson County District Court and on the first trial in the Circuit Court in which there was a mistrial, but it was not available on the last trial. Such is the "printed graph submitted by the machine" stated in appellant's Issue II. It may well be that if such missing graph had remained clearly legible until the time of the last trial, it would have afforded the most dependable evidence as to the percent of alcohol found in the breath tested, but it is clear from the testimony that it was not the only documentary evidence thereof relied upon by the witness in testifying in effect that the result was ".25 percent." There was another document, State's Exhibit 2, which was a duplicate carbon copy of a printed form of a "REPORT OF ALCOHOL CONTENT OF BLOOD" and "CHEMICAL TEST DATA," in which most of the blanks thereof had been filled in by the witness testifying for the State, the officer who arrested defendant and who was the operator of the machine in testing his breath, particularly the blank after the legend "Results of analysis," which was filled in by said witness as ".25." The court sustained defendant's objection to State's Exhibit 2. This exhibit is the "document" referred to by appellant in Issue III, which is made clear by the first two sentences of the argument in his brief as to Issue III:
 "Over these objections, the witness was immediately asked what reading was obtained when he tested the Defendant, to which the witness answered `.25 grams percent alcohol.' At this time, Officer Eaton was referring to State's Exhibit # 2, which had been marked for identification."
In our opinion, the trial court was in error in sustaining defendant's objection to State's Exhibit 2. Although State's Exhibit 1 and State's Exhibit 2 were apparently considered by all concerned chiefly as documents to refresh the then present recollection of the witness, State's Exhibit 2 is a memorandum of a "Past Recollection Recorded," as to which Judge McElroy states in McElroy's Alabama Evidence, § 116.01 (1977):
 "The second use of a memorandum occurs when the witness, after examining the memorandum, cannot testify to an existing knowledge of the fact, independent of the memorandum. This use of the memorandum is often referred to as Past Recollection Recorded; and if the witness testifies that, at or about the time the memorandum was made, he knew its contents and knew them to be true, then both his testimony and the memorandum become admissible. The memorandum and the witness' testimony are the equivalent of a present positive statement of the witness affirming the truth of the contents of the memorandum."
To any contention that State's Exhibit 2 was a carbon copy of the memorandum made by the witness, the answer is that it is a duplicate carbon copy and is admissible in evidence as to the truth of the contents of the original. Davis v. State,Ala.Cr.App., 387 So.2d 882 (1980).
On the voir dire examination of the State's witness by counsel for defendant, the witness testified:
 "Q. As far as your testimony as to the digital readout, then, on the night of July 11th, 1980, you don't have any independent memory other than these documents to refresh your recollection to that, is that correct?
 "A. The only recollection I have is from the previous trial and documents — and the cards.
 "Q. So any testimony that you would give from your oral testimony comes from reliance upon State's Exhibit 2 or other documents that you have reviewed since that time, is that correct?
 "A. Those are the documents that I filled out on giving the test." *Page 721 
The testimony of the witness as to the percent of alcohol in the tested breath when given to large extent on the basis of the use by the witness of State's Exhibit 2, a record made by the witness of "his past but since faded-away recollection" was properly admitted in evidence. Acklen's Executor v. Hickman,63 Ala. 494 (1879).
Before concluding our discussion of appellant's Issues II and III as they relate to State's Exhibit 2, it should be stated perhaps that neither the word "percent" nor the symbol "%" is contained in said exhibit. As previously stated, State's Exhibit 2 recites ".25" as the "Results of analysis." With due allowance for any difference between the actual or intended articulated language of the witness and the transcribed product, we quote the following extract from the transcribed testimony of the witness:
 "Q. But the final reading that you get is a percentage of alcohol in the blood?
 "A. It is what you get is a .25 grams percent per 100cc's of blood which means you have .25 100's of one cc is how much alcohol is in 100cc's of blood.
 "Q. So does that mean that if I have — let's say I have — if I were stopped and were to have a .05 reading, would that mean that five percent of my blood is alcohol?
"A. No.
"Q. What would —
 "A. .5, .05 100.s of that amount of blood is measured as alcohol.
 "Q. What we eventually get to then is what we are dealing with is how much alcohol has been absorbed in the blood system by the subject, is that correct?
"A. That's correct."
By Issue IV, appellant questions the qualification of the State's witness to testify "as an expert" as to the "results" of the "intoximeter test." The witness, a state trooper who had been with the Department of Public Safety since May 1, 1963, had received five days of training, eight hours a day, as to photoelectric intoximeters, three additional eight-hour days on the "gas chromatograph" and had been certified by the "State Health Department" as to the type of intoximeter that was used by him in performing the test upon the defendant in this case. He had run a total "in excess of 50" gas chromatograph intoximeter tests as a state trooper (less 3 or 5) prior to his testing the appellant. The only cases cited by appellant on the point, cases from other jurisdictions more than a quarter of a century old, when intoximeter testing was in its infancy, do not persuade us. The witness had had training and experience similar to that of the state trooper who was held to be qualified to testify as an expert as to the taking of an intoximeter test, and as to the results of the test, inPatterson v. State, Ala.Cr.App., 344 So.2d 543, writ denied,344 So.2d 547 (1977). The criterion for the admission of expert testimony in criminal prosecutions is that a witness, by study, practice, experience or observation as to a particular subject, has acquired a knowledge beyond that of an ordinary citizen, and whether a witness is qualified to testify as an expert is largely within the sound discretion of the trial court. Meadev. State, Ala.Cr.App., 390 So.2d 685, writ denied,390 So.2d 693 (1980). We think the witness was qualified to testify as an expert on the subject and that the trial court was correct in ruling accordingly.
By Issue V, appellant asserts that error is to be found in a statement in the presence of the jury by the prosecuting attorney, "during one of his own objections, that there was no jail punishment contemplated under the offense for which the appellant was charged." Whether jail punishment was contemplated or not, we do not know, but it was not given. The punishment fixed was a "fine of $500.00 and costs of court." The statement to which reference is made occurred prior to the introduction of any evidence and while counsel for defendant was making his opening statement of the case to the jury. The statements of both attorneys for the parties and all that is in the transcript on the subject are as follows:
 "MR. O'KELLEY [Defendant's attorney]: If you listen to the prosecutor, no question, *Page 722 
he is guilty, the prosecutor paints a pretty picture and if that is all there is to it, all to this case is what the prosecutor tells you, then find him guilty, send him on down to Sing-Sing or wherever —
 "MR. CARTEE [Prosecuting attorney]: Your Honor, we object, Mr. O'Kelley knows the punishment and knows there is no Sing-Sing or penitentiary punishment.
 "THE COURT: Let's proceed, gentlemen. Call your first witness, Mr. Cartee."
The entire performance as quoted above, other than what the trial court said, was out of place. It was mere argument, which should have been withheld until time for argument, and even then would have not met the test of proper argument. It was commenced by defendant's attorney by an insinuation that the crime charged was a felony, which it was not. The objection of the prosecuting attorney was made to an incomplete sentence by defendant's attorney. If the objection had been withheld until defendant's attorney had completed the sentence, the objection would have almost assuredly been sustained by the court for the reason that defendant could not have been punished, as insinuated by defendant's attorney, upon a conviction of the charge. The direction given by the court as to the occurrence was as favorable to defendant as any definite, correct ruling could have been as to the matter involved. Appellant concludes his argument as to Issue V by stating:
 "Such statement by the prosecuting attorney exceeded all bounds of propriety and causes appellant to be subject to the jury hearing testimony with the impression that the maximum punishment he could receive in the event of his guilt would be a fine. Such is obviously prejudicial and was not corrected at any time by the court."
We are far from certain that the jury was subjected to the "impression that the maximum punishment he could receive in the event of his guilt would be a fine." Even so, no ruling was invoked by defendant on the subject; there was no motion for a mistrial, no motion for clarifying instructions to the jury by the court. The trial court is not properly chargeable with prejudicial error in regard to the incident.
There was no error prejudicial to defendant. The judgment of the trial court should be affirmed.
The foregoing opinion was prepared by Retired Circuit Judge LEIGH M. CLARK, serving as a judge of this Court under the provisions of § 6.10 of the Judicial Article (Constitutional Amendment No. 328); his opinion is hereby adopted as that of the Court.
AFFIRMED.
All the Judges concur.