[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 68 
ON APPLICATION FOR REHEARING
The memorandum issued on July 9, 1999, is withdrawn and the following opinion is substituted therefor.
Nicholas Mester was convicted in the District Court of Blount County of driving under the influence, in violation of §32-5A-191(a)(2), Ala. Code 1975. This case comes to us on a direct appeal from the district court, pursuant to Rule 30.2, Ala.R.Cr.P., and § 12-12-72(1), Code of Alabama 1975. He has presented five issues on appeal.
The State offered the testimony of Officer Robert Dunston of the Blount County Sheriff's Department. He testified that between 2:00 a.m. and 2:40 a.m. he was at the Rainbow BP gasoline station at the intersection of Highways 231 and 278 in Blount County. Initially, he was inside the station. As he was getting into his car he noticed an automobile pushing a Mazda RX7 automobile onto Highway 231. He stated that he watched the cars proceed on Highway 231 to the "yield" sign and then turn onto Highway 278. Both vehicles were "swerving all over the road; especially the [RX7]." R. 20. He determined that the vehicles were unsafe, and he activated his blue light and pulled the cars over. Mester was behind the wheel of the RX7. After a brief conversation, Dunston determined that the RX7 would not start. Dunston noticed that Mester smelled strongly of alcohol, that his speech was slurred, that his eyes were bloodshot, and that his balance was off. Dunston administered a field sobriety test to Mester. Mester was instructed to walk nine steps heel to toe, with his hands by his side, counting out loud, and then turn and return in the same manner. Dunston stated that Mester's balance was off, that he missed heel to toe several times, and that he had to raise his hands for balance. Mester was also instructed to stand on one leg, raise the other leg in front, count out loud, and keep his hands to side. Dunston stated that Mester could not do this "without nearly falling down." R. 29. Dunston determined that it was unsafe for Mester to operate a motor vehicle, and he arrested him for driving under the influence. Mester was taken to the Blount County jail, where his blood alcohol content was determined to be .15.
The defense testimony was essentially as follows. Nichole Mester, the appellant's daughter, testified that about 1:00 a.m. on May 4, 1998, her Mazda RX7 automobile broke down and she coasted into a BP gasoline station at the intersection of Highway 231 and Highway 278 in Blount County. She telephoned her aunt, Lola Sanders, the appellant's sister, to come get her. She and her aunt went to Mester's house and woke him up to come help with the RX7. Mester was accompanied by his girlfriend's brother, William Haney, Jr. After arriving at the BP station, Mester went inside the station to purchase cigarettes. He saw Deputy Sheriff Dunston at that time. While Mester was inside the station a man, Mr. Hargrove, began to push the RX7 in an attempt to get it started. Nichole was behind the wheel of the RX7 at that time. The RX7 came to a stop on the side of the road on Highway 278. Mester says he then joined the group and told Nichole and Lola to find a chain and they would tow the car home. As the women left, Officer Dunston walked up. He determined that the car would not start, and he arrested Mester for driving under the influence. Mester stated that he was not driving the RX7 when Dunston allegedly saw it swerving. Mester admitted that he had had a few beers that evening but he, *Page 69 
Nichole, and Lola denied that Mester was drunk.
 I.
Mester contends that the prosecution failed to establish that Dunston had reasonable suspicion or probable cause to stop or arrest him for driving under the influence. Mester did not preserve these issues for review. These issues were presented for the first time in Mester's motion for a new trial and were bare assertions, without factual support. "`[A] motion for a new trial . . . is not sufficient to preserve the issue where no timely objection was made at the time the evidence was offered and admitted.'" Smith v. State, 756 So.2d 892, 905 (Ala.Cr.App. 1998), aff'd 756 So.2d 957 (Ala. 2000) quoting Newsome v. State, 570 So.2d 703,717 (Ala.Cr.App. 1989); Baker v. State, 683 So.2d 1,2 (Ala.Cr.App. 1995) ("`The grounds urged for a new trial must ordinarily be preserved at trial by timely and sufficient objections.'").
Moreover, Officer Dunston's testimony, if believed by the trial court, was sufficient to justify the stop and arrest. Dunston testified that Mester's automobile, which was being pushed down the road by another automobile, was weaving back and forth and appeared to be a hazard. This provided reasonable suspicion to stop Mester. After stopping Mester, Dunston testified that he smelled the strong odor of alcohol on Mester and that Mester's balance appeared to be off. Dunston determined that Mester could not satisfactorily perform field sobriety tests. This provided Dunston with sufficient probable cause to arrest Mester at the scent for driving under the influence.
 II.
Mester contends that, even conceding that he was under the influence of alcohol, the prosecution failed to prove beyond a reasonable doubt the he was in "actual physical control" of a motor vehicle. Mester argues that because it was undisputed that his automobile was inoperable, there was no proof that he had the "present ability" to operate the RX7.
Section 32-5A-191(a)(2), Ala. Code 1975, states that "[a] person shall not drive or be in actual physical control of any vehicle while . . . [u]nder the influence of alcohol."
 "`Actual physical control' is defined as the `exclusive physical power, and present ability, to operate, move, park, or direct whatever use or non-use is to be made of the motor vehicle at the moment.' . . . `Actual physical control' is determined by a totality-of-the-circumstances test. Cagle v. City of Gadsden, 495 So.2d 1144 (Ala. 1986)."
Davis v. State, 505 So.2d 1303, 1305 (Ala.Cr.App. 1987) (emphasis added).
Mester argues that because the Mazda RX7 had broken down and would not start, he did not have the "present ability" to operate it. According to Mester,
 "the ability of the RX7 to be operated, moved, or directed was wholly dependant upon an intervening force — another car; this intervening force was the source of propulsion for the RX7, and therefore served as the `present ability' to operate, move, park, or direct whatever use or non-use of the RX7 at the moment at issue. If you take away from the facts at hand the intervening force, then there was [no] present ability on Mester's part (or anyone else's part) to operate, move, park, or direct whatever use or non-use of the RX7."
Appellant's brief at page 15. (Emphasis provided by Mester.)
Disposition of this issue seems apparent after looking at the facts. As Mester stated in his brief, a "source of propulsion" had been provided for the RX7 and it was moving down a public roadway. As the RX7 was being pushed to its destination, Mester sat behind the wheel "driving" or guiding its direction and applying the brakes when necessary. Thus, Mester was in the driver's seat, behind the wheel, *Page 70 
determining the direction and speed (there was no evidence that the brakes did not work) of the RX7. It seems obvious that Mester was in actual physical control of a vehicle and that he had the present ability to move the vehicle.
We concede that there is no reported case exactly on point in Alabama[1]; however, as authority for the proposition that Mester was in actual physical control of his automobile, there are several cases from other jurisdictions whose DUI statutes are similar to Alabama's. These cases note, as the Colorado Supreme Court stated, that "it is not a requirement that the vehicle be moving on its own power, or that the vehicle travel a particular distance" in order to conclude that a defendant was in "actual physical control" of the automobile. Colorado Div. of Rev. v.Lounsbury, 743 P.2d 23, 27 (Colo. 1987).
 "Other jurisdictions have addressed factual situations in which a vehicle was being towed or pushed, and concluded that such actions constituted driving a vehicle under similar DUI statutes. See State v. Roberts, 139 Me. 273, 29 A.2d 457
(1942) (when car was being towed up an icy grade, in gear with engine running, and intoxicated defendants took turns sitting behind wheel, held to constitute operating a motor vehicle even though the car's front wheels were raised off the ground); Commonwealth v. Kallus, 212 Pa. Super. 504, 243 A.2d 483
(1968) (when motorist was in driver's seat of car stuck in a snowbank, in gear with engine running, and other people were attempting to push car out of the snowbank, held to constitute operation of a motor vehicle); Hester v. State, 196 Tenn. 680, 270 S.W.2d 321 (1954) (when automobile was being steered by an intoxicated person but the engine was not running and another vehicle was pushing it, held to constitute physical control of a motor vehicle under drunk driving statute); Chamberlain v. State, 163 Tex.Crim. 529, 294 S.W.2d 719 (1956) (when intoxicated motorist was steering his car and the engine was not running, but he was being pushed on the highway by another car, held to constitute operating a motor vehicle); State v. Tacey, 102 Vt. 439, 150 A. 68 (1930) (when intoxicated operator was steering automobile while it was being towed, held to constitute operating a motor vehicle); Gallagher v. Commonwealth, 205 Va. 666, 139 S.E.2d 27 (1964) (when car was stuck and intoxicated operator was accelerating the engine but unable to get vehicle out of ditch, held to constitute operating the vehicle). Compare People v. Kelley, 27 Cal.App.2d 771, 70 P.2d 276 (1937) (based on these particular facts, when defendant moved his `nearly demolished' car by having others push it a few feet to a safe location out of the traffic flow, held not to constitute driving under the statute). See generally Annotation, What Constitutes Driving, Operating, or Being in Control of Motor Vehicle for Purposes of Driving While Intoxicated Statute or Ordinance, 93 A.L.R. 3d 7 (1979)."
743 P.2d at 26-27; see Harris v. State, 97 Ga. App. 495,103 S.E.2d 443 (1958) (vehicle pushed by another car, then coasted down street without engine running, held to constitute operating a motor vehicle), overruled on other grounds, Luke v. State,177 Ga. App. 518, 340 S.E.2d 30 (1986); State v. Ferrenti, 1 Conn. Cir.Ct. 108, 22 Conn. Sup. 494, 175 A.2d 378 (1961) (defendant's being behind steering wheel of disabled automobile, which was being pushed along *Page 71 
highway by another vehicle, held to constitute operating a motor vehicle);People v. Heimann, 142 Ill.App.3d 197, 491 N.E.2d 872, 96 Ill.Dec. 593 (1986) (intoxicated defendant's being behind the wheel of inoperative automobile attempting to start it was held to constitute his being in control of vehicle).
Based on the facts presented in this case, the trial court correctly found sufficient evidence was presented indicating that Mester was in actual physical control of the automobile.
 III.
Mester contends that the trial court erred in admitting non-certified copies of pages from the Intoxilyzer 5000 ("I-5000") logbooks. The I-5000 measures blood-alcohol content. The logbooks reflect whether the I-5000 is in good working order (also known as being properly calibrated) at the time the test is administered. It does this by indicating on relevant pages that the I-5000 machine passed timely inspections as required by statute. The I-5000 logbooks also contain the test results of those to whom the test is administered. Specifically, at trial and on appeal, Mester contends that the pages from the I-5000 logbook submitted into evidence at his trial were not properly authenticated because, he says, the prosecution did not prove that they had been certified by the custodian of records of the Blount County Sheriff's Department and the pages were not under seal so as to be self-authenticated. Mester contends that the introduction of the pages that contained the test results, without a proper predicate, was reversible error. We agree that the prosecution did not prove that the offered pages from the logbook had been certified by the custodian of records of the Blount County Sheriff's Department. This conclusion pretermits a discussion concerning the necessity of a seal in order to allow self-authentication.
 "`Section 32-5A-194(a)(1), Ala. Code 1975, provides that blood alcohol tests shall be admissible so long as the tests "have been performed according to the methods approved by the Department of Forensic Sciences." The rules of the Alabama Department of Forensic Sciences relating to chemical tests for intoxication, Chapter 370-1-1, provide that breath-testing equipment shall be inspected at least once each calendar month by an implied consent unit inspector for the Department of Public Safety. . . . Thus, blood alcohol test results may be admissible under the statute if the officer who performed the inspection testifies that the device was properly calibrated.
 "`In Ex parte Mayo, the Alabama Supreme Court set out an alternate method for establishing the necessary predicate for the introduction of I-5000 results:
 "`"To establish a predicate for admitting the test results, without reliance on the statute [§ 32-5A-194, Ala. Code 1975], there should be evidence that:
 "`"(1) the theory underlying the photoelectric intoximeter test is valid and generally accepted as such;
 "`"(2) the intoximeter is a reliable instrument and is generally accepted as such;
 "`"(3) the intoximeter test was administered by a qualified individual who could properly conduct the test and interpret the results, and
 "`"(4) the instrument used in conducting the test was in good working condition and the test was conducted in such a manner as to secure accurate results."
 "`652 So.2d 201, 209 (Ala. 1994) (quoting Moore v. State, 442 So.2d 164, 167 (Ala.Cr.App. 1983)).
 "`Under either method of establishing the predicate for the introduction of test results, the State is required to show that the device was in proper working condition when the test was *Page 72 administered. This showing can be made in one of two ways. The officer who performed the inspection of the device can give direct testimony that it was in proper working condition, or the State may introduce a certified copy of the inspection logbook that reflects that the device passed inspection before and after the test was administered. See Gwarjanski v. State, [Ms. CR-95-0672, December 20, 1996] 700 So.2d 357 (Ala.Cr.App. 1996).
 "Steiner v. State, [Ms. CR-96-0137, Sept. 26, 1997] 706 So.2d 1308, 1310 (Ala.Cr.App. 1997)."
Davis v. State, 712 So.2d 1115, 1115-16 (Ala.Cr.App. 1997) (emphasis added).
It appears from the testimony adduced at trial that Dunston properly administered the I-5000 test. However, Dunston had no personal knowledge concerning the proper calibration of the machine, other than the information contained on the logsheet itself. Thus, the person who inspected the I-5000 machine did not testify. Therefore, the State made no attempt to authenticate by direct testimony the offered pages from the logbook. The State attempted to establish that the I-5000 machine was in proper working order by offering "certified" copies of relevant pages from the logbook. A certified document is self-authenticated. See Rule 902(4), Ala.R.Evid. However, the purported certification contained on the pages from the logbook admitted into evidence is signed by the "Corrections Lieutenant" at the Blount County Sheriff's Department. There was no evidence presented to identify, nor did the certification itself identify, the "corrections lieutenant" as the person who is the custodian of the records for the Blount County Sheriff's Department. Moreover, there was no indication that the corrections lieutenant was the person who had inspected the I-5000 machine.[2] Moreover, we note that no predicate was laid to admit the logsheets into evidence under the business records exception to the hearsay rule.[3]
Absent proper certification, the logsheets were not admissible as *Page 73 
self-authenticating documents. Thus, the State failed to establish the necessary predicate to admit the I-5000 test results.
 IV.
Mester contends that the prosecution failed to prove, beyond a reasonable doubt, that he was under the influence of alcohol to the extent that it affected his ability to safely operate a vehicle. Specifically, he argues that the results of the Intoxilyzer 5000 test were improperly admitted, leaving only the officer's assertion that Mester smelled alcohol and the officer's subjective opinion concerning the field sobriety tests on which to base a conviction. Mester was charged under § 32-5A-191(a)(2), Ala. Code 1975.
 "To establish a prima facie case of driving while under the influence of alcohol under § 32-5A-191(a)(2), the state must prove beyond a reasonable doubt that the appellant drove, or was in actual physical control of, a motor vehicle while he was under the influence of alcohol to such an extent that it affected his ability to operate his vehicle in a safe manner. Ex parte Buckner, 549 So.2d 451, 453 (Ala. 1989); Frazier v. City of Montgomery, 565 So.2d 1255, 1257 (Ala.Cr.App. 1990)."
Goodwin v. State, 728 So.2d 662, 667 (Ala.Cr.App. 1998).
Although the results of the Intoxilyzer 5000 test were improperly admitted into evidence (see our discussion in Part III of this opinion),
 "even if the test results were improperly admitted . . . the conviction is still due to be affirmed. The admission of evidence apparently illegal may be rendered prejudicially innocuous by subsequent legal testimony to the same effect or from which the same facts can be inferred."
Estes v. State, 358 So.2d 1050, 1054 (Ala.Cr.App. 1977), cert. denied, 358 So.2d 1057 (Ala. 1978). In Estes improperly admitted test results for a photoelectric intoximeter test (PEI) did not require a reversal where the court found that other evidence of the defendant's intoxication was staggering and overwhelming. The court stated, "[a]ny legal presumption of intoxication arising from the test results was insignificant in view of the testimony by the actual observers of the appellant's condition." Estes, 358 So.2d at 1055-56. But see, Curtis v. City of Sheffield502 So.2d 833(Ala. 1986) (other evidence of intoxication was not staggering and overwhelming).
An arresting officer may give his opinion concerning a defendant's intoxication. Grimes v. State, 488 So.2d 8, 9
(Ala.Cr.App. 1986). Here, Dunston's testimony that Mester's car was weaving, that Mester smelled of alcohol, that his speech was slurred, that his eyes were bloodshot, that his balance was "off", that he failed the field tests, and that it was Dunston's opinion that Mester was intoxicated, established that Mester was unable to safely *Page 74 
drive an automobile because he was intoxicated. We have held that "`the testimony of the arresting officer . . . is of itself sufficient to present a factual issue as to the intoxication of defendant and justifies the denial of defendant's motion to exclude the evidence made at the conclusion of the State's evidence.'" Charles v. State, 424 So.2d 715, 717
(Ala.Cr.App. 1982). To the extent that conflicting evidence existed, it was not so strong or persuasive as to overcome credible evidence to the contrary.
 "`In an ore tenus proceeding, it is the duty of the trial court to resolve conflict in testimony and render judgment accordingly. Where the trial court resolves a factual issue on conflicting evidence, the reviewing court may not reverse it if there is any credible evidence to support the judgment.'"
Richarson v. State, 668 So.2d 130, 137 (Ala.Cr.App. 1995) (quotingBig Ticket Broadcasting Co. v. Santos, 594 So.2d 1241, 1243-44
(Ala.Civ.App. 1991) (citations omitted). Considering the evidence in a light favorable to the prosecution, we find that the evidence was sufficient to sustain a conviction for driving under the influence as defined under § 32-5A-191(a)(2) Ala. Code 1975.
 V.
Mester contends that the trial court erred in admitting into evidence the test printouts generated by the I-5000 test. For the reasons stated in part III, the test results were not admissible.
Based on the foregoing, Mester's conviction is affirmed.
APPLICATION OVERRULED; MEMORANDUM WITHDRAWN; OPINION SUBSTITUTED; AFFIRMED.
Long, P.J., and McMillan, Baschab, and Fry, JJ., concur.
[1] In McLaney v. City of Montgomery, 570 So.2d 881 (Ala.Cr.App. 1990), the defendant argued that she could not be convicted for driving under the influence because the officer did not see her driving and because her car was inoperable at the time of the alleged offense. The defendant's automobile was stuck on a wooden rail at a railroad crossing at the time she was arrested. TheMcClaney court did not discuss the significance of the fact that the automobile was inoperable. The McLaney court determined that the only reason the defendant's automobile was stuck on the rail was because it had been driven there by the intoxicated defendant.
[2] "`"A `certified copy' of a public record is one that is signed and certified as a true copy by the officer who has lawfulcustody of the original." C. Gamble, McElroy's Alabama Evidence, Section 218.01 (3rd ed. 1977), cited with approval in Yelton v.State, 294 Ala. 340, 344, 317 So.2d 331 (1974).' (Emphasis added.)Lidge v. State, 419 So.2d 610, 615 (Ala.Cr.App. 1982)." Zinn v.State, 527 So.2d 146, 147 (Ala.Cr.App. 1987), rev'd on other grounds 527 So.2d 148 (Ala. 1988).
 "A typical certificate reads: `I Jimmy Bob Bohannon, hereby certify that I am the Director of the Department of Vital Statistics for the Alabama State Board of Health and that the attached document is a true and accurate copy of an original, official record in my custody.'"
Terry L. Butts et al., Alabama Evidentiary Foundations, p. 65 (1999).
In the instant case, the certification read:
 "I, Lt. M. Kent, Blount County Sheriff's Department, do hereby certify that the above and foregoing is a true and correct copy of Intox logs. This the 15 day of May, 1998.
"[Signed,] Lt. M. Kent
"Title: Corrections Lt."
Vol. 2, State's exhibit number 7.
The instant certification contains no assertion that Lt. M. Kent, a corrections lieutenant, is the officer who has lawful custody of the logbook.
[3] In addition to authenticating a document by certification, a business record may be authenticated by the following:
 "`Testimony by any witness, frequently the custodian of the record, that the document now exhibited to him is a record of the business; that he knows the method (i.e., the standard operating procedure) used in the business of making records of the kind now exhibited to him; and that it was the regular practice of the business to make records of such kind and to make them at the time of the event recorded or within such specified period thereafter as could be found by the trier of fact to be reasonable, is a sufficient authentication of the record to require its admittance in evidence.'
 "[C. Gamble,] McElroy's [Alabama Evidence,] § 254.01(3) [(3d ed. 1977)].
 "`The [business records] rule does not require that the person who made the entry be the witness who lays the foundation for the introduction of the record into evidence. . . . Any witness who knows the method used in the business of making records of the kind in question and knows that it was the regular practice of the business to make such records at the time of the event in question or within a specified reasonable time thereafter is competent to lay the foundation by testifying that the exhibit is such a record."
"Ikner v. Miller, 477 So.2d 387, 390 (Ala. 1985).
Parker v. State, 587 So.2d 1072, 1091-92 (Ala.Cr.App. 1991), aff'd610 So.2d 1181 (Ala. 1992) (citations omitted).
Once a business record has been authenticated, it cannot be admitted into evidence under the business records exception to the hearsay rule until a proper foundation has been laid.
 "`[A] properly authenticated business record is admissible in evidence when a foundation, as outlined in the Code, is laid by the proponent of the evidence. Section 12-21-43 requires that it be shown (1) that the record or writing was made as a memorandum or record of an act, transaction, occurrence, or event; (2) that the record was made in the regular course of business; and (3) that it was the regular course of business to make such a memorandum or record at the time of such act, transaction, occurrence, or event, or within a reasonable time thereafter. See also C. Gamble, McElroy's Alabama Evidence, § 254.01(3) (3d ed. 1977).'"
McDonald v. State, 586 So.2d 259, 262 (Ala.Cr.App. 1991) (quotingEx parte Frith, 526 So.2d 880 (Ala. 1987)).