BURKE, Judge.
Tenia M. Crow pleaded guilty to child abuse, a violation of § 26-15-3, Ala.Code 1975. Crow was sentenced to imprisonment in the Alabama Department of Corrections for one year and one day, but the sentence was split, and she was ordered to serve six months in the county jail followed by supervised probation.
Crow preserved for appellate review the issue of whether the trial court erroneously ruled, following a pretrial evidentiary hearing, that the seven-year-old victim, T.T., who was living with Crow, but who was not her biological child, would be deemed an unavailable witness for purposes of admitting T.T.’s out-of-court statements at-trial because Crow allegedly had her sister, Tracy Gaddis, remove T.T. from the jurisdiction'of the court before trial. See, §§ .15-25-31 and 15-25-32, Ala. Code 1975. (CR. 213, R. 82.). The circuit court’s pretrial ruling would allow T.T.’s school nurse, his school guidance counsel- or, and his Department of Human .Resources caseworker to testify regarding T.T.’s statements to them during their investigation of his alleged physical abuse.
Sections 15-25-31 and 15-25-32(2)a.2, Ala.Code 1975, allow for the admission of out-of-court statements from a child less than 12 years old when the defendant or someone acting on the defendant’s behalf has intentionally removed the. child from the court’s jurisdiction. See § 15-25-32(2)a.2 (“[A] child is unavailable if the defendant or someone acting on behalf of the defendant intentionally removes the child from the jurisdiction of the court.”).
“The sufficiency of proof for establishing the predicate of unavailability is left to sound discretion of the trial court.” Johnson v. State, 623 So.2d 444, 447-48 (Ala.Crim.App.1993); Matkins v. State, 521 So.2d 1040, 1042 (Ala.Crim.App.1987)(“ ‘The sufficiency of the proof of the predicate of unavailability of an absent witness is addressed to the sound discretion of the trial judge.’ ” (quoting Napier v. State, 377 So.2d 1135, 1138 (Ala.Crim.App.1979)). A trial court’s ruling on whether' a witness is unavailable to testify is given great deference and will be reversed only if there was an abuse of discretion. See, e.g., Flowers v. State, 799 So.2d 966, 980 (Ala.Crim.App.1999). Moreover, “[i]n an ore tenus proceeding, it is the duty of the trial court to resolve- conflict in testimony and render judgment accordingly.” Mester v. State, 755 So.2d 66, 74 (Ala.Crim.App.1999) (citations and quotations omit *348 ted). “Where the trial court resolves a factual issue on conflicting evidence, the reviewing court may not reverse it if there is any credible evidence to support the judgment.” Id. at 74.
At the pretrial hearing conducted on the State’s motion to have T.T. declared an unavailable witness, a generous amount of testimony was elicited regarding who had legal custody or care of T.T. and regarding Gaddis’s knowledge of her responsibility to assure that T.T. attended court. However, regardless of custody or what instructions Gaddis allegedly received regarding T.T.’s attending court, the State’s burden was to prove that Crow had Gaddis remove T.T. from the circuit court’s jurisdiction.
The following facts were presented at the pretrial hearing regarding Crow’s alleged intentional removal of T.T. from the circuit court’s jurisdiction.
Elizabeth Dawson investigates alleged child-abuse cases for the Elmore County Department of Human Resources (“DHR”). She became involved in T.T.’s case on February 15, 2013, when she was contacted by T.T.’s school to investigate bruising on T.T. Following the accusations that Crow had whipped T.T., DHR placed T.T. with Crow’s sister, Gaddis, as part of a DHR authorized “safety plan.” (R. 16.)
Dawson testified that DHR did not “authorize[ ] Ms. Gaddis to let the child leave the State because he might be summoned to court.” (R. 14.) According to Dawson, Gaddis “knew.that if [T.T.] was expected to go to the court hearing that [Gaddis] would need to take him.” (R. 14-15.) Dawson testified that she informed Gaddis
“that if the child were to be required to come to court that she would be responsible for getting him there ... because it is our understanding that the child was in her care at that point so it was her responsibility to make sure that, you know, he came to anything that he was required to come to at that time.”
(R. 13.) Dawson learned in January 2014 that T.T. was in Texas and was not coming back to Alabama.
“[Gaddis] had advised- [Dawson] that [Gaddis] had taken [T.T.] over the Christmas holidays to Texas to stay with her brother and there was no intentions of him coming back. [Dawson] had advised [Gaddis] that [Gaddis] knew that, you know, court was coming up and that he was supposed to be there. [Gaddis] advised that she had no idea that he was supposed to be at court in January.”
(R. 15.)
Tyler Delashaw is a police investigator with the City of Millbrook. He testified and the record discloses, that on February 15, 2013, Crow gave a videotaped statement to the police in which she stated that she had whipped T.T. with a belt. At some point during Crow’s interview, she was left alone in the interview room. The video recording remained on. The video recording captured Crow making a telephone call to her sister, Gaddis. The video recording was played in open court. On direct examination Officer Delashaw testified that what he heard on the video recording was Crow saying to Gaddis, “I’ve got to get rid of [T.T.], got to get [T.T.] .out of here.” (R. 24, 25.) Officer Delashaw testified that T.T. was taken to Texas after this telephone call.
On cross-examination, Officer Delashaw stated that he did not know when T.T. was taken to Texas; he just knew he had been taken to Texas. The video recording was played again for Officer Delashaw. Officer Delashaw then testified that upon listening to the video recording again, what he heard on the videotape was “[Crow] staffing Gaddis] had to get [T.T.] out of here.” (R. 26.) He then asserted “You know, we weren’t sure what that meant,” *349 but “[Crow] said [Gaddis] had to get him out of here.” (R. 26.) Defense counsel challenged Officer Delashaw, stating that counsel “did not hear that. If it is in there, I would like it on the Record. If it is not, I would like that on the Record.” (R. 26.) The trial court did not respond, but the State asserted that the video recording would be provided for the court “to look at.” (R. 27.) Upon continued questioning by the defense, Officer Dela-shaw acknowledged that the video recording did not disclose any instructions from Crow to take T.T. to Texas. Officer Dela-shaw conceded that he did not hear Crow “in this recording ever , direct Ms. Gaddis to do anything with [T.T.] ”. (R. 27.) Defense counsel again asserted to the trial court that counsel did not hear on the video recording “[Crow] stat[ing Gaddis] had to get [T.T.] out of here” as Officer Delashaw had claimed he discerned from the video recording. (R. 26.) Counsel requested a transcript of the recording or, in the alternátive, more time to review the recording “because that is not what was said” on the recording. (R. 28.) The trial court did not respond to counsel’s request but instead told the State to call its next witness.
Gaddis testified that Crow, Gaddis, and T.T.’s father are siblings. T.T.’s father was in prison in Texas when the child-abuse charges were brought against Crow. Gaddis stated that Crow did telephone her during her interview with the police. Gad-dis testified that Crow stated during that telephone call that “[Crow] has to do something with [T.T.], either [Gaddis has] to take [T.T.] because [T.T.] was trouble, so I took [T.T.] ”. (R. 30.) Crow did not tell Gaddis “to do anything with the boy.” (R. 38.) Based on that telephone call, Gaddis took control of T.T. on February 15, 2013.
Gaddis testified that she had T.T. for about one year before leaving him in Texas with his father, who was released from prison in December 2013. Gaddis testified that contrary to Dawson’s testimony, Gad-dis was not informed that she would be responsible for bringing T.T. to court; nor was she informed not to take T.T. out of the state. Gaddis testified that she did not receive a subpoena at any time instructing her to bring T.T. to court. Gaddis further testified that no one told her to take T.T. to Texas, Gaddis said that it was not unusual for her. to take vacation in Texas because her children and grandchildren live there. She and T.T. went to, and from Texas during the summer of 2013. Gaddis testified that when she returned to Texas in December 2013, it was to-visit her children and grandchildren for Christmas. Gaddis testified that she had no intention of leaving T.T. in Texas until his father arrived and wanted the child. She testified:
“[T.T.’s father] was in prison at the time that DHR was involved, but he- got out of prison during Christmas. He was at the house, at my daughter’s house during Christmas. That’s when he said he wanted his child.”
(R. 35.)
She stated that “I have no full custody. I had temporary custody. I had to give him his child.” (R. 32-33.) Gaddis further explained:
“Every six months his mother had to write another temporary custody paper. What they gave me wasn’t full custody. It was nothing I could do for [T.T.] with temporary custody. His parents wanted him back when I got to Texas.”
(R. 33.) The trial court asked Gaddis what she meant by the above statement. She responded,
“It meant that in order for me to take care of my nephew, I would have to have ■full custody. I tried to get his Social Security card. Social Security office *350 told ra'e I did not have’full custody of [T.T.] I tried to get like day care. They wanted to go by my income. In order for me to have—to do the things I needed to do to help [T.T.], I had to have full custody which his parents wouldn’t give me. When I went to Texas, I asked for full custody. My brother said I’m not ■fixing to give you full custody. Leave my child here. That’s what I did. And this Iady[, an- assistant district attorney,] called me- and asked me who I was. I told her my name was Tracy [Gaddis]. She asked me where was [T.T.] I said with h[er] brother. I told her that I was leaving [T.T.] in Texas with his father. She said okay. If she should have told me when I talked to her on at the phone that I had to bring [T.T.] back, I would have brought him back. But not once did she say that I had to bring [T.T.] back to Alabama. I talked to her. I told her that I was leaving him in Texas.”
(R. 33-34.) Gaddis further explained that she told the assistant district attorney “the DA” that T.T. was in the custody of his father living with her brother Todd. She gave the DA Todd’s telephone number. Gaddis testified that a few days after she left Texas she learned that
- “[t]he DA called my brother Todd where [T.T.] and his dad was living with my brother Todd. She talked to Todd and asked Todd to bring him back. And he said that he didn’t have any money, so she told him that she would postpone everything for six months. Maybe by then, he would have enough money to bring [T.T.] back to Alabama for court.”
(R. 40-41.) Gaddis testified that the DA did not tell her to bring T.T, back from Texas. Gaddis testified that she did not talk to Crow about “any of this.” (R. 43.)
Crow testified at the hearing. Crow testified that the State “don’t know what they are talking about” when they claim the video recording discloses that she stated “we’ve got to get rid of [T.T.] (R. 55.) She stated, .“we all sat and listened to [the recording], • I didn’t hear nothing that said you got to get rid of [T.T.] I didn’t never say anything like that.” (R. 55.) ' She testified that she telephoned her sister, Gaddis, from the police station and told her “you need to come and get [T.T.], I can’t take care of [T.T.], he’s .bad.” (R. 52.)
“[T]he reason why I was saying that is because I knew they were going to take [T.T.] I didn’t want [T.T.] to be in the system. So what I was meaning you need to come get [T.T.], not to come get [T.T,] and take him to Texas. That ' didn’t even come to my mind.”
(R. 52.) Crow testified that she did not direct anyone to do anything with T.T.
“Why would I tell [Gaddis] to take [T.T.] out [to] Texas. I wasn’t indicted. I didn’t know I was being arrested. I wasn’t arrested until when, July? I was told by DHR that the case had been dropped. So why would I tell [Gaddis] to take [T.T.] to Texas anyway. Common sense will let you know I wasn’t indicted. I wasn’t arrested.”
(R. 56.)
“[W]hat I’m saying is that my sister had to come and get my nephew because I knew they were going—I didn’t want him into the system. . That’s all that was.”
(R. 57.)
T.T. was first subpoenaed on September 23, 2013, to appear in court for trial on October 7, 2013. (R. 5.) Crow testified as follows regarding subpoenas:
“First time I got a subpoena for [T.T.], first time I came to court. That was like a year—the first time I got a subpoena for [T.T.], I told [Gaddis] *351 about that. [T.T.] was still here in Alabama when I got the first subpoena. Now any other subpoenas, I did not receive any of that.
[[Image here]]
“I got a subpoena at the beginning, but I didn’t get a subpoena for him to be in court today. No, I did not.”
(R. 58-59.) Crow reiterated that when she received a subpoena for an earlier court appearance she told Gaddis and Gaddis brought T.T. to court. ' Crow reasserted that she did not receive a subpoena for the instant court date.
“A. I told [Gaddis] that I got a subpoena for [T.T.] to be in court and [T.T.] was here.
“Q. And now [T.T.] is not here?
“A. I did not get a subpoena for [T.T.] to be here.”
(R. 60.)
“Q. The subpoena you got, did you say February?
“A. It was the first'' subpoena, first time we ever came to court. I can’t remember when, but it was the first subpoena. I’m going, why would they subpoena [T.T.] at my house. [T.T.] is not here. So I called [Gaddis] and I said, [Gaddis], [T.T.]-got a subpoena for him to be in court. She said, okay, I said,- make sure he’s there. She said, okay.
“Q. Was he here?
“A. He was here, yes, sir.
“Q. That was the last subpoena you ever got?
“A. Yes, sir.
“Q. Did you feel it was your responsibility to ensure that [T.T.] was here today?
“A. No. It’s not my responsibility. It was [Gaddis’s] responsibility or whoever. All I know is that [Gaddis] took [T.T.]— she said—when she came back from Texas, I said, [Gaddis], where is [T.T.]? She goes, well, [the father] said , he wanted his son and wouldn’t give .ipe. full custody. I said—She said, I can’t bring him back. It would be like kidnapping. So I didn’t have nothing to do with it. Had nothing to do with it. I know I had to go to court and [T.T.] is not here, so.
“Q. When you had control over the matter, you did try to ensure he was here by telling [Gaddis]?
“A. When I received the ■ subpoena, I told [Gaddis] I received a subpoena for [T.T.] to be in court and [T.T.] was here.
“Q. That was the last subpoena you ever got?
“A. That’s the last-one.
“MR. BUSH [defense attorney]: That’s all I have.” 1 '
(R. 61-62.)' Crow further testified that she knew Gaddis had taken T.T. to Texas and back two or three times during the year he lived with Gaddis. Crow stated that 'after signing the DHR’s paper giving her rights over T.T. to Gaddis, Crow was prohibited from seeing him alone and had no more “say” over T.T. (R. 53.) She further stated that she had never been in trouble before'and that she did everything that DHR asked her to do. Crow asserted that she had nothing to do with T.T.’s failure to attend court.
Following the pretrial hearing conducted on June 16, 2014, the circuit court entered the following two written orders finding T.T. t,o be an unavailable witness.
“Case called. [Crow present with counsel, Hon. Peter Bush. Hearing on the State’s Notice of Intent to Declare the Victim Unavailable. Witnesses’ testimony taken. Exhibits accepted. Court determines that the victim, [T.T.] is unavailable for trial on Thursday, June 19, 2014. -
*352 “DONE this 16th day of June, 2014.”
(CR. 179.)
“Case called and testimony being taken on the issue of the availability of the victim as a witness. Court determining that the under 12 years of age witness is unavailable and was transported to Texas by the Safety Plan custodian, Tracy Gaddis.
“This Court is to inform the jury that the out of Court statement by the witness/victim was taken without the Defendant being afforded an opportunity to cross-examine the out [sic] court. Additionally, the Court will advise the jury that it has conducted a trustworthiness hearing before admitting the out of Court testimony.
“DONE this 17th day of June, 2014.”
(CR. 182.) On June 18, 2014, Crow filed a motion asking the circuit court to alter, amend, or vacate its June 16, 2014, order. Before the trial was scheduled to begin on June 19, 2014, Crow was allowed to present arguments in support of the motion, after which the motion was denied.
As previously stated, the State had the burden of proving that Crow directed Gaddis to remove T.T. from the circuit court’s jurisdiction.
We first note that, in the present case, although the record indicates that the video recording was played in open court twice, the video recording itself was not entered into evidence and, thus, was not made a part of the record on appeal. “An appellate court may only consider the facts contained in the record on appeal, and it may not presume any facts not shown by that record and make them a ground for reversal.” Carden v. State, 621 So.2d 342, 346-47 (Ala.Crim.App.1992). “ ‘[T]his Court cannot predicate error on matters not shown by the record, nor can we presume error from a silent record.’ ” Owens v. State, 597 So.2d 734, 736 (Ala.Crim.App.1992). ‘“Where the record is silent on appeal, it will be presumed that what ought to have been done was not only done, but rightly done.’ ” Id., quoting Jolly v. State, 405 So.2d 76 (Ala.Crim.App.1981).
The testimony at the hearing was that, on February 15, 2013, T.T. went to school with visible bruises, and also on February 15, 2013, the police recorded an interview with Crow. During a break in the questioning, Crow telephoned her sister, Gaddis, who had taken custody of T.T. pursuant to a DHR “special care” order on February 15, 2013. A video recording of the telephone conversation was played in open court twice. Officer Delashaw testified regarding the statements he heard on the video recording. Although Officer Dela-shaw conceded that he did not hear Crow specifically direct Gaddis to remove T.T. from the court’s jurisdiction and that he was not sure what Crow’s statement actually meant, Officer Delashaw maintained that he had heard Crow say that Gaddis “had to get [T.T.] out of here.” (R. 26.) Therefore, there was testimony presented that would support a finding that Crow had directed Gaddis to remove T.T. from the court’s jurisdiction.
Although Crow is correct in her assertion that there was conflicting evidence presented at the hearing, it was the duty of the circuit court to resolve conflicts in the evidence, and this Court may not reverse the trial court’s determination if there is any credible evidence to support the judgment. See Mester, 755 So.2d at 74. As stated earlier, we must give great deference to the circuit court’s ruling on the unavailability of a witness. See Flowers, 799 So.2d at 980. Accordingly, because there was testimony from Officer Delashaw about Crow’s statements to Gad-dis and because the circuit judge had the opportunity to hear the video recording *353 himself, we cannot say that the circuit court abused its discretion in determining that Crow directed Gaddis to remove T.T. from the court’s jurisdiction.
Based on the foregoing, the judgment of the circuit court is due to be affirmed.
AFFIRMED.
WINDOM, P.J., and JOINER, J., concur.
WELCH, J., dissents, with opinion.
KELLUM, J., joins in dissent.