Rel: June 28, 2024

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is published in **Southern Reporter**.

# Alabama Court of Criminal Appeals

## OCTOBER TERM, 2023-2024

_____

## CR-2022-1213

_____

## Altonio Spencer

## v.

## State of Alabama

## Appeal from Mobile Circuit Court
## (CC-18-287 and CC-18-288)

McCOOL, Judge.

Altonio Spencer appeals his convictions for pharmacy robbery, see § 13A-8-51, Ala. Code 1975; and first-degree robbery, see § 13A-8-41, Ala. Code 1975. The trial court sentenced Spencer to life imprisonment

without the possibility of parole for his pharmacy-robbery conviction and to 240 months' imprisonment for his first-degree-robbery conviction.

Facts and Procedural History

On June 21, 2017, Misty Morton was working as the store manager at a Walgreens drugstore in Mobile. The drugstore closed at 10:00 p.m., and by 10:30 p.m. Morton and another employee, Ivan Lockett, were walking out of the drugstore when an armed intruder forced them back inside at gunpoint. Once inside the drugstore, the armed intruder forced Morton to give him the money from a safe and then made a telephone call. Two other intruders entered the drugstore shortly thereafter, one of whom, according to Morton, was Spencer. The armed intruder then instructed Morton to open the pharmacy, but Morton told him that she did not have a key to the pharmacy. Spencer and the intruder who had entered the drugstore with him then "start[ed] trying to open [the pharmacy] with [a] crowbar and [a] hammer" while the armed intruder held Morton and Lockett at gunpoint. (R. 227.) When Spencer and his accomplice were unable to break into the pharmacy, the armed intruder told Lockett to "ram [his] body into" the door, and Lockett "kept running at it until he" managed to break into the pharmacy. (R. 228.) The three

intruders then took "all of the medicine out of the cabinet" and placed it into a trash can, which they took with them when they fled the scene in a Honda automobile. (R. 231.) During Morton's testimony, the State played several videos recorded by the surveillance cameras in the drugstore, and those videos show Spencer participating in the offenses. Those videos also reveal that Spencer was armed with a handgun during the offenses, though he was not the armed intruder who first entered the drugstore and held Morton and Lockett at gunpoint.

According to Morton, "there were tracking devices inside of the bottles" that the intruders took from the pharmacy (R. 235), and, shortly after the intruders left the drugstore, police officers with the Mobile Police Department were provided with tracking information that led them to a house in Mobile, where they found the Honda automobile in which the intruders had fled the scene. One person ran from the house as the officers approached, but he was quickly apprehended and told the officers that there were two other people inside the house. The officers then set up a perimeter around the house, and, when the two occupants of the house would not "voluntarily come out," "the SWAT team … forced entry" and took the two occupants, including Spencer, into custody. (R.

3

196.) Spencer was found "locked in a closet inside of [a] bedroom," where he "was sitting on top of" a "large trash bag full of narcotics." (R. 395.) In addition to those narcotics, the officers found "a lot" of other "narcotics and controlled substances" throughout the house (R. 251), including one bottle of "oxycodone" that contained "a tracker that had been put in there by Walgreens." (R. 279.) The officers also found approximately $6,000 in United States currency, a "money wrapper" on which was printed the name "Walgreens" (R. 315), and two handguns, one of which looked similar to the handgun Spencer had in his possession while inside the drugstore.

Chris Savage was employed as the pharmacy's asset-protection manager at the time of trial, but he was not employed by the pharmacy at the time of the offenses. Savage testified as follows regarding the tracking devices used by the pharmacy:

"Q. Can you explain the mechanics about how the tracker works in a pill bottle?

"A. Inside of the pill bottle they have a tracker that sits on top of a magnet. When it pulls off the magnet, it triggers that as an alert to the corporate system where they track that. That begins the process of tracking that device.

"Q. When it begins tracking the device, does it generate any information or data?

4

"A.   Yes.

"Q.   In what form?

"A.   Basically it's a spreadsheet is what we will normally get. About every 10 or 15 seconds it will ping it using wifi. It tracks its location using longitude and latitude, time.

"Q.   Who is that information sent to?

"A.   In this case it will be -- Blue Tracks is the vendor that had that particular tracker. Then it's sent to our security operations center. They work in conjunction with local law enforcement where the tracker was activated.

"Q.   The company that owns the tracker immediately sent it over to the Walgreens security team and then they relayed it to police?

"A.   Yes.

"Q.   When that information is generated, is it compiled into a report?

"A.   Yes.

"Q.   Is that done every time?

"A.   It's always -- it's an electronic report. It's always being generated.

"Q.   So that happens automatically; there is not some human being sitting behind a computer typing that information in?

"A.   From the moment they activate the tracker.

5

"Q. Is that record kept in the regular course of business of Walgreens?

"A. Yes."

(R. 352-353.) The State then proffered the tracking report for admission into evidence, and the trial court admitted it over Spencer's objection.

Savage also testified, over Spencer's objection, as to the contents of a "DEA report" that had been created at the pharmacy following the offenses:

"Q. I want to talk about [the DEA report]. What is it that is reported on that list?

"A. Generally when there is a loss of a C II drug, a Schedule II drug --

"Q. Before you go on, what does the term 'Schedule II' drug mean?

"A. It's a narcotic of some sort that is highly regulated from the government.

"Q. C II, is that a law that lists what certain drugs are?

"A. Yes.

"Q. So this is listed in law as a controlled substance?

"A. Yes.

"Q. You said there was a list that generates C II drugs?

"A.  Yes.

"Q.  What is that list?

"A.  This is a DEA 106. It's a common practice for the pharmacies when they take an inventory of those C II drugs, if there is missing drugs they have to report it up on the 106 report to the government, the pharmacy, DEA. If drugs are stolen it's the same thing -- lost or stolen -- they have to generate that report which means if there is an event where a robbery occurred or a loss occurred, immediately they have to inventory those drugs in question and then report up any missing.

"Q.  The way they do that, do they keep an inventory every time that a certain drug is sold or used at the store?

"A.  It's a perpetual tracking type of device. Sold. Received. Then they will do periodic counts, or smart counts at Walgreens. When they do counts they keep a perpetual inventory electronically.

"Q.  You are saying that at almost all times on a regular basis there is a list of what drugs are supposed to be at Walgreens?

"A.  Yes.

"Q.  Then after drugs are taken they compare what is left to the list of what is supposed to be there?

"A.  Yes.

"Q.  That's how the list of what was taken was generated?

"A.  That's correct.

"....

"Q.  Were you able to make a comparison to any of the drugs that were recovered?

"A.  Yes.

"....

"Q.  What were you comparing?

"A.  The drugs listed on the DEA 106 to the pill bottles that were there.

"Q.  What did that comparison show you?

"A.  They were right on the money.

"Q.  When you say 'right on the money,' what does that mean?

"A.  As far as the drugs that were listed on the DEA 106 were basically present on the table there."

(R. 357-62.)  Although the trial court allowed Savage to provide that testimony, it refused to admit the DEA report into evidence because it found that the State had not timely provided the report to Spencer.

The jury found Spencer guilty of pharmacy robbery and first-degree robbery.  During the sentencing hearing, the State presented the trial court with certified copies of Spencer's four prior convictions, which are for the offenses of first-degree receipt of stolen property, see § 13A-8-17, Ala. Code 1975; second-degree assault, see § 13A-6-21, Ala. Code 1975;

8

breaking and entering a vehicle, see § 13A-8-11(b), Ala. Code 1975; and unlawful possession of a firearm, see § 13A-11-72, Ala. Code 1975. The State then argued that, given those four convictions, the Habitual Felony Offender Act ("the HFOA"), see § 13A-5-9, Ala. Code 1975, required the trial court to sentence Spencer to either life imprisonment without the possibility of parole or life imprisonment for his pharmacy-robbery conviction. The State noted, though, that § 13A-8-52, Ala. Code 1975, provides that any person who is convicted of pharmacy robbery is not eligible for parole. Thus, the State argued that, in this case, the trial court was required to sentence Spencer to life imprisonment without the possibility of parole for his pharmacy-robbery conviction. The trial court agreed with the State and imposed that sentence, finding that it did not "have the leeway to give [Spencer] any leniency" and was "required by law, given [Spencer's] past history, to impose a sentence of life in prison without the possibility of parole." (R. 593.) The trial court sentenced Spencer to 240 months' imprisonment for his first-degree-robbery conviction.

<u>Discussion</u>

9

Spencer raises several claims on appeal that, he says, entitle him to relief.

## I.

Spencer argues that the trial court erred "in multiple evidentiary rulings." (Spencer's brief, p. 24.) We address each evidentiary ruling in turn, keeping in mind that "'[t]he question of admissibility of evidence is generally left to the discretion of the trial court, and the trial court's determination on that question will not be reversed except upon a clear showing of abuse of discretion.'" Windsor v. State, 110 So. 3d 876, 880 (Ala. Crim. App. 2012) (quoting Ex parte Loggins, 771 So. 2d 1093, 1103 (Ala. 2000)). In addition, Rule 45, Ala. R. App. P., states:

> "No judgment may be reversed or set aside, nor new trial granted in any civil or criminal case on the ground of … improper admission or rejection of evidence, …unless in the opinion of the court to which the appeal is taken or application is made, after an examination of the entire cause, it should appear that the error complained of has probably injuriously affected substantial rights of the parties."

## A.

Spencer argues that the trial court erred by allowing Savage "to testify about the contents of the [DEA] report." (Spencer's brief, p. 25.) As noted, the trial court allowed Savage to testify that the DEA report

10

was a list of the controlled substances that were stolen from the pharmacy on June 21, 2017; that he had compared the DEA report to the substances found in the house where Spencer was arrested; and that his comparison had revealed that the substances listed on the DEA report were the substances found in that house.

Spencer first argues that Savage's testimony should have been excluded from evidence because, he says, the State did not timely disclose the DEA report and he therefore did not have an adequate opportunity to review it before trial. However, the record indicates that the State provided Spencer with the DEA report on April 6, 2022 -- five days before Spencer's trial began -- and Spencer did not request a continuance so that he could have additional time to review the report.[1] There is also no indication in the record that the trial court would have refused to grant a continuance had Spencer requested one.

> "In Minnis v. State, 690 So. 2d 521 (Ala. Crim. App. 1996), this Court found that certain evidence should have been, but was not, disclosed to defense counsel before trial; however, this Court stated:

---

[1]The State claimed at trial that it did not receive the DEA report until April 6, 2022, and that it provided Spencer with the report "within 10 minutes of … getting it." (R. 36.)

11

"'The appellant did not seek a continuance or request a recess. As we noted in McLemore v. State, 562 So. 2d 639, 645 (Ala. Cr. App. 1989):

"'"Under the circumstances presented here, ... it appears 'that either a recess or continuance would have been sufficient to protect [the appellant's] interests and permit him to review and evaluate this particular evidence in the same manner as had he received this information prior to trial. Having failed to make any showing to the contrary and having failed to request either a continuance or recess, [the appellant] cannot claim error on the part of the trial court in denying his request to exclude the evidence. United States v. Bartle, [835 F.2d 646 (6th Cir. 1987)]; United States v. Kubiak, [704 F.2d 1545 (11th Cir.), cert. denied 464 U.S. 852, 104 S. Ct. 163, 78 L. Ed. 2d 149 (1983) ].'"'

"690 So. 2d at 527."

Jennings v. State, 965 So. 2d 1112, 1120 (Ala. Crim. App. 2006). Thus, this Court will not hold the trial court in error for admitting Savage's testimony regarding the DEA report because Spencer received the report five days before trial and did not request a continuance so that he could have additional time to review the report.

12

Spencer also argues that Savage's testimony should have been excluded from evidence because of his "lack of personal knowledge about the content and creation of the DEA report." (Spencer's brief, p. 29.) In support of that argument, Spencer cites Rule 602, Ala. R. Evid., which provides that a witness "may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."

It is true that Savage did not have "personal knowledge about the content and creation of the DEA report" because he was not employed by the pharmacy at the time of the offenses. However, that fact simply means that the DEA report was hearsay that could potentially be admissible under the business-records exception to the rule against hearsay. See Rule 803(6), Ala. R. Evid. (providing that business records are admissible as an exception to the rule against hearsay if certain foundational criteria are satisfied). As the Advisory Committee's Notes to Rule 602 explain: "Nothing in Rule 602 prevents a witness, if authorized under Rule 801 et seq., from relating a hearsay statement."

In Craft v. State, 90 So. 3d 197 (Ala. Crim. App. 2011), this Court stated:

13

"'"'[A] properly authenticated business record is admissible in evidence when a foundation, as outlined in the Code, is laid by the proponent of the evidence. Section 12-21-43[, Ala. Code 1975,] requires that it be shown (1) that the record or writing was made as a memorandum or record of an act, transaction, occurrence, or event; (2) that the record was made in the regular course of business; and (3) that it was the regular course of business to make such a memorandum or record at the time of such act, transaction, occurrence, or event, or within a reasonable time thereafter. See also C. Gamble, McElroy's Alabama Evidence, § 254.01(3) (3d ed. 1977).'"

"'McDonald v. State, 586 So. 2d 259, 262 (Ala. Cr. App. 1991) (quoting Ex parte Frith, 526 So. 2d 880 (Ala. 1987)).'

"Mester v. State, 755 So. 2d 66, 72-73 n.3 (Ala. Crim. App. 1999))."

Craft, 90 So. 3d at 212.

"'"'The [business records] rule does not require that the person who made the entry be the witness who lays the foundation for the introduction of the record into evidence .... Any witness who knows the method used in the business of making records of the kind in question and knows that it was the regular practice of the business to

14

> make such records at the time of the event in question or within a specified reasonable time thereafter is competent to lay the foundation by testifying that the exhibit is such a record.'

"'"Ikner v. Miller, 477 So. 2d 387, 390 (Ala. 1985)."

"'Parker v. State, 587 So. 2d 1072, 1091-92 (Ala. Cr. App. 1991), aff'd, 610 So. 2d 1181 (Ala. 1992) (citations omitted).'"

Craft, 90 So. 3d at 212 (emphasis added).

In this case, Savage testified that he had approximately 20 years' experience as an "asset protection specialist" (R. 351), that it is the "common practice" of pharmacies to create and maintain DEA reports as a "perpetual tracking type of device" for "what drugs are supposed to be" at the pharmacy, and that pharmacies "have to generate that report … if there is an event where a robbery occurred."  That testimony tended to demonstrate that Savage "knows the method used in the business of making records of the kind in question and knows that it was the regular practice of the business to make such records at the time of the event in question or within a specified reasonable time thereafter."  Craft, 90 So. 3d at 212 (citations omitted).  Thus, Savage's testimony was sufficient to authenticate the DEA report under the business-records exception to the

rule against hearsay; the fact that he did not create the DEA report himself was a fact that went to the weight to be afforded his testimony regarding the contents of the report, not its admissibility. Accordingly, the trial court did not err by allowing Savage to testify that the DEA report was a list of the controlled substances that were stolen from the pharmacy on June 21, 2017.

B.

Spencer argues that the trial court erred by admitting the tracking report. As noted, the tracking report detailed the longitude and latitude of a tracking device in one of the pharmacy's pill bottles as that device traveled from the pharmacy to the house where Spencer was arrested. However, Spencer fails to explain how he was prejudiced by the tracking report. Instead, Spencer merely makes the cursory allegation that he did not have "a reasonable opportunity to review and investigate the [tracking report] to prepare and present a complete defense" (Spencer's brief, p. 30), without explaining how additional time to review the report would have aided his defense. Spencer's failure to explain how he was prejudiced by the tracking report provides a basis, in and of itself, for denying him relief on this claim. See Kemp v. State, 314 So. 3d 230, 239-

40 (Ala. Crim. App. 2019) ("Kemp's failure to argue that he was prejudiced by the admission of the allegedly inadmissible hearsay is sufficient in and of itself to deny Kemp relief on this issue.").

Moreover, we fail to see how Spencer was prejudiced by the tracking report. The tracking report indicated nothing more than that a bottle of pills had been taken from the pharmacy to the house where Spencer was arrested on the date the offenses occurred. However, the actual tracking device was admitted into evidence, and the State provided a witness who testified that the device had been found in the house where Spencer was arrested. Furthermore, the evidence indicating that Spencer stole controlled substances from the pharmacy was overwhelming and virtually ironclad. Thus, it is clear to this Court that Spencer's substantial rights were not affected, nor was he otherwise prejudiced, by a report that merely detailed the route the tracking device had traveled on its way from the pharmacy to the house where Spencer was arrested. For that reason as well, Spencer is not entitled to relief on this claim.

C.

Spencer argues that the trial court erred by admitting the videos recorded by the surveillance cameras in the drugstore. In support of that

17

argument, Spencer claims that "the State provided a working file of the videos less than a week before trial" and that, as a result, he "had minimal time to review the videos presented at trial." (Spencer's brief, p. 32.) Spencer also argues that he "receiv[ed] a working copy of only a few of the … videos." (Id., p. 33.) However, Spencer did not request a continuance so that he could have additional time to review the videos, and, as we have already noted, there is no indication in the record that the trial court would have refused to grant a continuance had Spencer requested one. Thus, Spencer is not entitled to relief on this claim. See Jennings, 965 So. 2d at 1120 (holding that, because the defendant had "failed to request either a continuance or recess, [he] [could not] claim error on the part of the trial court in denying his request to exclude ... evidence" that had not been timely disclosed to him (citations omitted)).

## II.

Spencer argues that his convictions violate the Double Jeopardy Clause of the Fifth Amendment to the United States Constitution because, he says, first-degree robbery is a lesser-included offense of pharmacy robbery. Spencer did not raise this claim below. However, "[m]ultiple convictions in a single proceeding for both a greater- and a

lesser-included offense has been recognized as a double-jeopardy claim that implicates the trial court's jurisdiction," and jurisdictional claims may be raised for the first time on appeal. T.D.F. v. State, 264 So. 3d 108, 118 (Ala. Crim. App. 2018) (citing Ex parte Benefield, 932 So. 2d 92 (Ala. 2005)).

"[T]he Double Jeopardy Clause prohibits convictions for 'both a greater offense and a lesser offense included within the greater offense.'" Tice v. State, 367 So. 3d 1168, 1170 (Ala. Crim. App. 2022) (quoting Williams v. State, 104 So. 3d 254, 265 (Ala. Crim. App. 2012)).

> "In Ford v. State, 612 So. 2d 1317 (Ala. Crim. App. 1992), this Court explained:
>
>> "'"'[T]o be a lesser included offense of one charged in an indictment, the lesser offense must be one that is necessarily included, in all of its essential elements, in the greater offense charged[,]' Payne v. State, 391 So. 2d 140, 143 (Ala. Cr. App.), writ denied, 391 So. 2d 146 (Ala. 1980), ... unless it is so declared by statute."
>
> "'James v. State, 549 So. 2d 562, 564 (Ala. Cr. App. 1989). "Whether a crime constitutes a lesser-included offense is to be determined on a case-by-case basis." Aucoin v. State, 548 So. 2d 1053, 1057 (Ala. Cr. App. 1989). "In determining whether one offense is a lesser included offense of the charged offense, the potential relationship of the two

19

offenses must be considered not only in the abstract terms of the defining statutes but … also … in light of the <u>particular facts</u> of each case." <u>Ingram v. State</u>, 570 So. 2d 835, 837 (Ala. Cr. App. 1990) (citing <u>Ex parte Jordan</u>, 486 So. 2d 485, 488 (Ala. 1986); emphasis in original). <u>See also</u> <u>Farmer v. State</u>, 565 So. 2d 1238 (Ala. Cr. App. 1990).'

"612 So. 2d at 1318. The 'particular facts' of each case are those facts alleged in the indictment. Thus, 'the statutory elements of the offenses and facts alleged in an indictment -- not the evidence presented at trial or the factual basis provided at the guilty-plea colloquy -- are the factors that determine whether one offense is included in another.' <u>Johnson v. State</u>, 922 So. 2d 137, 143 (Ala. Crim. App. 2005)."

<u>Williams v. State</u>, 104 So. 3d 254, 264 (Ala. Crim. App. 2012). Thus, to determine whether first-degree robbery is a lesser-included offense of pharmacy robbery in this case, we begin by looking at the statutory elements of those offenses.

Section 13A-8-41 provides that a person commits first-degree robbery if he uses or threatens the use of force against another person during the course of committing a theft and is either armed with a deadly weapon or dangerous instrument or causes serious physical injury to another person. Section 13A-8-51(2) provides that a person commits pharmacy robbery if he commits a theft of a controlled substance from a "pharmacy," as that term is defined by § 13A-8-51(1), and, in the course

20

of committing that theft, "violates Section 13A-8-41." (Emphasis added.)

Thus, first-degree robbery is "necessarily included, in all of its essential

elements, in [pharmacy robbery]." Williams, 104 So. 3d at 264 (citations

omitted). However, that fact alone does not mean that first-degree

robbery is a lesser-included offense of pharmacy robbery in this

particular case. Rather, as noted, to make that determination we must

look at the specific facts of the case as alleged in the indictments.

The indictment charging Spencer with first-degree robbery states:

"The GRAND JURY of said county charge, that, before the finding of this indictment Altonio Spencer whose name is to the Grand Jury otherwise unknown than as stated, did, on or about June 23, 2017, in the course of committing or attempting to commit a theft of property to-wit: United States Currency and/or Narcotics, the property of Walgreens, use or threaten the imminent use of force against the person of Misty Morton and/or Ivan Lockett, with intent to compel acquiescence to the taking of or escaping with the property, while the said Altonio Spencer or another participant was armed with a deadly weapon or dangerous instrument, to-wit: a gun, in violation of § 13A-8-41(a)(1) of the Code of Alabama, against the peace and dignity of the State of Alabama."

(C. 21.)

The indictment charging Spencer with pharmacy robbery states:

"The GRAND JURY of said county charge, that, before the finding of this indictment Altonio Spencer whose name is to the Grand Jury otherwise unknown than as stated, did, on or about June 23, 2017, in the course of committing or

21

attempting to commit a theft of property to-wit: Hydrocodone and/or other assorted controlled substance, the property of Walgreens, use or threaten the imminent use of force against the person of Misty Morton and/or Ivan Lockett, with intent to compel acquiescence to the taking of or escaping with the property, while the said Altonio Spencer or another participant was armed with a deadly weapon or dangerous instrument, to-wit: a gun, in violation of § 13A-8-41(a)(1) and 13A-8-51 of the Code of Alabama, against the peace and dignity of the State of Alabama."

(C. 17.)

The State argues that first-degree robbery is not a lesser-included offense of pharmacy robbery in this particular case because the first-degree-robbery indictment charged Spencer with the theft of "United States Currency and/or Narcotics," whereas the pharmacy-robbery indictment charged him with the theft of "Hydrocodone and/or other assorted controlled substance." Thus, the State argues, "Spencer could commit one offense, e.g., stealing over $6,000 from Walgreens, without committing the other, e.g., stealing a slew of controlled substances." (State's brief, p. 16.) Based on this Court's holding in Gholston v. State, 57 So. 3d 178 (Ala. Crim. App. 2010), we are not persuaded by the State's argument.

In Gholston, Ronnie Lee Gholston was convicted of both first-degree theft of property and first-degree robbery. On appeal, Gholston argued

22

that his convictions violated the Double Jeopardy Clause because, he said, the theft offense was included in the robbery offense. In addressing that claim, this Court first noted that the theft indictment had charged Gholston with the theft of a 2003 Ford Taurus automobile owned by A.C., and the robbery indictment had charged Gholston with robbing A.C. during the course of committing a theft of "Lawful United States Currency and/or a 2003 Ford Taurus." Gholston, 57 So. 3d at 185. Then, after setting forth the statutory elements of first-degree theft of property and first-degree robbery, the Court stated:

> "Gholston was charged with first-degree theft for stealing A.C.'s 2003 Ford Taurus automobile. Gholston was also charged with first-degree robbery for threatening the use of force while armed with a deadly weapon while committing a theft of 'Lawful United States Currency and/or a 2003 Ford Taurus' (C.R. 13) (emphasis added). The circuit court instructed the jury that it could find Gholston guilty of first-degree robbery based on the underlying theft of A.C.'s 2003 Ford Taurus. (R. 776.) Therefore, the jury could have found Gholston guilty of first-degree theft and first-degree robbery based on the unlawful taking of the same property, i.e., a 2003 Ford Taurus.
>
> "Accordingly, '[b]ased on the statutory elements of the crimes and the facts alleged in the indictments, it is clear that the theft forming the basis for the theft [conviction could have been] the same theft underlying the robbery [conviction].' Crayton v. State, 949 So. 2d 976, 978 (Ala. Crim. App. 2006); see also Deardorff v. State, 6 So. 3d 1205, 1215 (Ala. Crim. App. 2004) (holding that first-degree theft of property was a

23

> lesser-included offense of robbery; therefore, Deardorff's convictions for first-degree theft of property and murder made capital because it was committed during the course of a robbery violated double-jeopardy principles). Consequently, the first-degree theft of property offense, as alleged in the indictment, was a lesser-included offense of the first-degree robbery offense, and Gholston's convictions for both crimes violate the Double Jeopardy Clause of the Fifth Amendment."

Gholston, 57 So. 3d at 185-86.

In this case, the pharmacy-robbery indictment charged Spencer with committing robbery "against the person of Misty Morton and/or Ivan Lockett" while committing a theft of "Hydrocodone and/or other assorted controlled substance." The first-degree-robbery indictment charged Spencer with committing robbery "against the person of Misty Morton and/or Ivan Lockett" while committing a theft of "United States Currency and/or Narcotics." (Emphasis added.) Consistent with that indictment, the trial court instructed the jury that, to convict Spencer of first-degree robbery, it had to find, among other facts, that Spencer had "committed or attempted to commit the theft of U.S. currency and/or narcotics." (R. 554 (emphasis added).)

Thus, as was the case in Gholston, "it is clear that the theft forming the basis for the [first-degree-robbery] [conviction could have been] the same theft underlying the [pharmacy-]robbery [conviction]." Gholston,

24

57 So. 3d at 185 (citation omitted). In other words, the jury could have found that Spencer committed pharmacy robbery because he threatened the use of force against Morton and Lockett while he was armed with a deadly weapon and was committing a theft of substances from the pharmacy, and the jury could have also found that Spencer committed first-degree robbery based on those same facts, i.e., that he threatened the use of force against Morton and Lockett while he was armed with a deadly weapon and was committing a theft of substances from the pharmacy.[2] Therefore, Spencer's "first-degree [robbery] offense, as alleged in the indictment, was a lesser-included offense of the [pharmacy] robbery offense, and [Spencer's] convictions for both crimes violate the Double Jeopardy Clause of the Fifth Amendment." Gholston, 57 So. 3d at 185.

"The proper remedy when a defendant is convicted of both a greater and a lesser-included offense is to vacate the conviction and the sentence for the lesser-included offense." Williams, 104 So. 3d at 265. Accordingly,

---

[2]The fact that one indictment alleged the theft of "Hydrocodone and/or other assorted controlled substance" and that the other alleged the theft of "Narcotics" does not salvage the first-degree-robbery conviction. It is clear that the substances at issue were the substances in the pharmacy.

25

we remand this case to the trial court with instructions for that court to vacate Spencer's first-degree-robbery conviction.

III.

Spencer argues that he was "improperly sentenced" for his pharmacy-robbery conviction. (Spencer's brief, p. 39.) Specifically, Spencer argues that the trial court, relying on § 13A-8-52(b), "believe[ed] the only legal punishment it could impose was life [imprisonment] without parole." (Spencer's brief, p. 39.) According to Spencer, § 13A-8-52(b) is not applicable in this case, and he argues that the trial court was instead required to sentence him under the HFOA, which, he says, would have resulted in a sentence of either life imprisonment without the possibility of parole or life imprisonment.

Section 13A-8-52 states:

> "(a) Upon conviction of the criminal offense of 'pharmacy robbery' as defined in Section 13A-8-51(2), the offender shall be imprisoned at hard labor for not less than 10 years nor more than 99 years and shall be ineligible for consideration for parole, probation or suspension of sentence.
>
> "(b) On a second or subsequent conviction under this article, the offender shall be imprisoned for the remainder of his natural life and shall be ineligible for consideration for parole, probation or suspension of sentence."

(Emphasis added.) Thus, a defendant who is convicted of pharmacy robbery is not to be sentenced under § 13A-8-52(b) unless he also has a prior conviction for pharmacy robbery. See Hannah v. State, 627 So. 2d 1090, 1093 (Ala. Crim. App. 1992) ("If any of the appellant's prior convictions were for pharmacy robbery, he should have been sentenced under § 13A-8-52(b), Code of Alabama 1975. On the other hand, if none of the appellant's prior convictions were for pharmacy robbery, the trial court must apply the enhancement provisions of § 13A-5-9.").

As noted, the four prior convictions that the State proved at Spencer's sentencing hearing are for the offenses of first-degree receipt of stolen property, second-degree assault, breaking and entering a vehicle, and unlawful possession of a firearm. Thus, because none of Spencer's prior convictions are for pharmacy robbery, he correctly argues that the mandatory sentence of life imprisonment without the possibility of parole required by § 13A-8-52(b) is inapplicable in this case. Instead, the trial court was required to apply the HFOA to Spencer's pharmacy-robbery conviction. Hannah, supra. However, contrary to Spencer's belief, it appears that the trial court did apply the HFOA to that conviction but recognized that the only sentence it could impose under

27

the HFOA was life imprisonment without the possibility of parole. Given the specific facts of this case, that conclusion was correct.

Spencer's four prior convictions are for Class B and Class C felony offenses.[3] The HFOA provides that, when a defendant has at least three prior felony convictions but no prior convictions for a Class A felony, then upon conviction of a Class A felony (such as pharmacy robbery) "he or she must be punished by imprisonment for life or life without the possibility of parole, in the discretion of the trial court." § 13A-5-9(c)(3). Thus, the minimum sentence Spencer could receive for his pharmacy-robbery conviction is life imprisonment -- a fact he concedes. That fact is significant because § 13A-8-51(a) and (b) both provide that a person who is convicted of pharmacy robbery "<u>shall be ineligible for consideration for parole</u>, probation or suspension of sentence." (Emphasis added.) In other words, the trial court correctly recognized that a sentence of life imprisonment under the HFOA would effectively be a sentence of life imprisonment without the possibility of parole because no person who is convicted of pharmacy robbery is eligible for parole. Therefore, the trial

---

[3]First-degree receipt of stolen property is a Class B felony. Second-degree assault, breaking and entering a vehicle, and unlawful possession of a firearm are Class C felonies.

court did not "improperly sentence" Spencer for his pharmacy-robbery conviction.

IV.

Spencer argues that the trial court "erred in failing to conduct even a preliminary inquiry into [his] competency prior to sentencing." (Spencer's brief, p. 34.) According to Spencer, "reasonable grounds existed to doubt [his] competency to proceed with sentencing," which, he says, required the trial court to order "a mental evaluation … prior to sentencing, and to order a competency hearing if necessary." (Id., p. 38.) Some procedural history is necessary for a clear understanding of this claim.

The sentencing hearing was scheduled for August 11, 2022. On August 8, 2022, defense counsel filed a "Motion for Rule 11[, Ala. R. Crim. P.,] Evaluation." (C. 116.) That motion, which noted that Spencer still had four charges pending against him, stated:

"These cases originated in 2017.

"Spencer has previously appeared before this court.

"Upon information and belief, he has never had a Rule 11 completed or mental evaluation ordered.

29

"Counsel and [Spencer] have completed the trial on the first two counts. Spencer was convicted.

"Upon receipt of the pre-sentence investigation, it was noted that Spencer is being treated and receiving prescription medication for a serious mental illness.

"Counsel of record did not have knowledge of the diagnosis during the preparation of the prior cases.

"Counsel respectfully requests that this court order a mental evaluation for [Spencer] in the instant case.

"As a precautionary measure, counsel … respectfully requests that the evaluation encompass a time-of-offense evaluation for [Spencer's] remaining charges.

"Counsel is requesting a lawyer's continuance of the hearing due to a personal conflict on August 11, 2022."

(Id.) The trial court granted defense counsel's request for a continuance and scheduled a hearing for August 15, 2022.

At the August 15, 2022, hearing, the following colloquy occurred:

"THE COURT: This is State of Alabama versus Altonio Spencer, CC-18-287, 288, 289, 286, 291, and 292. Now, the first two cases, Mr. Spencer has stood trial for and been convicted for. What is before the court is to impose sentence on those cases. In the meantime, with regard to the other cases the defendant has filed a motion for a Rule 11 evaluation and a motion to reset these cases for disposition for the court to determine that a Rule 11 evaluation is called for.

"Let the record reflect that Mr. Spencer is here in court with [defense counsel]. Let's talk about your motion that Mr.

30

Spencer be evaluated pursuant to Rule 11 of the Alabama Rules of Criminal Procedure.

"[DEFENSE COUNSEL]: I think maybe in the case there may have been some lost in translation. My prayer for relief just asks for a continuance of the hearing. On the last hearing that we had I received the [presentence investigative report]. I received the information about the diagnosis, medication, all those things. Your Honor said I should take some investigation and try to find out what is there. I have not completed that investigation which is why I didn't ask that you rule on the motion. I just ask that you continue the hearing.

".....

"THE COURT: I understand. [State,] do you have any difficulty with us resetting this ...?

"[THE STATE]: Yes, I do. If I can explain that, the test for a Rule 11 evaluation is not does the defendant have a mental disease or defect and what are the records relating to it. It's that the defendant lacks sufficient present ability to assist his or her counsel by consulting with a reasonable degree of rational understanding of the facts and legal proceedings against the defendant.

"There has been mention that after the [presentence investigative report] [defense counsel] learned that [Spencer] had a disorder that he receives treatment for. There has been no showing whatsoever that from when this originated in 2017 to any pre-trial issues, during the trial, and now during sentencing, the defendant has ever shown a lack of rational understanding of the facts, lack of rational understanding of the proceeding against him, or lack of ability to assist his counsel in any of the matters associated with this case.

"THE COURT: I think what may be a little confusing -- [defense counsel], correct me if I am wrong. I don't know with regard to the two cases where Mr. Spencer has been convicted of that that is an issue. I think that [defense counsel] is referring to the cases that are yet to come that are set for disposition today. Since there may be an offer that could potentially resolve all of his cases, he is asking that the sentence be postponed along with the disposition. I don't think there is an issue with the two cases that he has been convicted on. I could proceed on and sentence him today in those cases. I'm hearing you say, let me have an opportunity to look at the mental status and to take all of this into consideration along with a global offer.

"[DEFENSE COUNSEL]: Correct. Whether you sentence him separately on that or not, I think right now I'm at a lack of information to do that. With respect to the State's response, quite frankly, I asked specifically for a reset. I did not ask to argue the merits of the motion. If I were to proffer to the court, my concern would be the outstanding cases and them trailing the current cases. Just at the outset, number one, I don't think myself or the State is in a position to presume what a person suffers from bipolar or schizophrenia present as. Myself being a person that has practiced extensively in the probate court, there are some high functioning people who suffer from bipolar schizophrenia at any given time and my ability to assess to their rational appreciation or their rational decision making process, that's beyond my -- not the scope of my responsibility.

"With respect to the remaining decision, even if we were to take just the hearings, without getting into conversations with my client about specific pieces of evidence that we reviewed, specific pieces of evidence we have had to go through, the appreciation of whether or not those things going forward would impact his decision on making a global offer or not. Just for what has been before the court, we sat here and had a 30-minute hearing on a telephone call which was

32

recorded about certain things. My client to this day has been fixated and maintained even with several conversations in court about the sentencing ranges and all those things that there are certain outcomes that just are not present before the court in these cases.

"THE COURT: I understand. I'm inclined to give you some leeway to get all that done. I think we need to bring it to a head.

"[DEFENSE COUNSEL]: Sure. If you want to put them all on the same day, we can do that.

"....

"I understand it is a blind plea. What is important here, if I'm in a conversation with my client and my client does not appreciate the ramifications of, say, accepting and trying each one of those cases --

"THE COURT: We may have to deal with that. I'm going to give you some extra time to do what you feel like you need to do to get information. We will set it for October 6[, 2022]."

(Supp. R. 3-9.)

At the October 6, 2022, hearing, the following colloquy occurred:

"THE COURT: State of Alabama versus Altonio Spencer, CC 18-287 and 288. The purpose of the hearing today is to impose sentence on Mr. Spencer. By way of reference, the jury found Mr. Spencer guilty by unanimous verdict on April 14, 2022. The court ordered a [presentence investigative report]. It was received by the court on July 6 of this year. At that point in time prior to sentencing, [defense counsel] requested that the court reset the sentencing to allow him to make an inquiry into certain matters including the mental status of Mr. Spencer. That was filed by [defense

33

counsel] on April 8 of this year. Have we gotten the report back?

"[DEFENSE COUNSEL]: We don't have a mental evaluation. There was an objection filed by the State. Well, I asked for additional time to inquire whether or not there were any current records regarding the mental status. I was able to secure some records from the metro jail which would confirm that Mr. Spencer has been receiving, in fact, mental-health treatment since his initial admission to the metro jail, including mental-health treatment from the Department of Corrections. The diagnoses that are listed in the [presentence investigative report] at least one of which I believe by statute would be considered serious mental illness. I'm not obviously a psychiatric physician or psychologist who is capable of determining whether or not Mr. Spencer at different times or even at times during our representation was suffering from any symptoms of a bipolar disorder or the manic disorders that are listed.

"That end, he does have the remaining decision to be made on cases in which -- I don't know what the status of the State's offer would be -- I have had interactions with him. At the very least a person suffering from bipolar disorder or schizophrenia do[es] at some time hold fixed delusions about certain things. I would not be capable of assessing whether or not he was impacted by that.

"THE COURT: What are you asking me to do at this point? It looks to me as though -- I don't know what Mr. Spencer's mental condition was at any time prior to and including the trial of these two cases and the jury's guilty verdict in these two cases and the court setting it down for sentencing. I don't know of any legal precedent that would allow me to go back and inquire as to his mental state after these cases have been submitted to the jury, the jury determined their verdict, and I set it for sentencing. If you have some legal authority for me to look at that gives me

34

authority to consider that, I would be happy to do that. I suspect that the law is that it would be mandatory for the court to proceed on with the sentencing in these two cases and perhaps look at the mental condition of Mr. Spencer as it applies in the other cases. I don't have any legal authority that says that either.

"I guess, I'm looking to you to see if you have any legal precedence that addresses the situation. It's a bit unusual that we get a request for a mental evaluation between the jury's verdict of guilty and the court's adjudication of guilty and the imposition of sentence. If there is such a case out there I would like to read it.

"….

"[DEFENSE COUNSEL]: I don't have a specific case cite on that. You know, obviously I understand the State's challenge. With respect to this I do think he would definitely be entitled to the Rule 11 on the remaining cases.

"THE COURT: I appreciate that. I will order that on the remaining cases for sure. I just don't know that I can do anything that would slow the sentencing process down here in these two cases.

"[DEFENSE COUNSEL]: If anything, I think at this stage if Your Honor is inclined to proceed with sentencing if I could go on record and note for purposes of appeal that I have given notice to the court. I received notice of conditions that to some degree I think -- I can look back toward certain interactions. Without a full appreciation of what the picture may have been I might not have had an understanding of what the decisions being made could have reflected. With that said, I would like to preserve the issue of the request for Rule 11 at this time for appeal in the event that on a future review, it is found that he should have been entitled to that in the previous cases.

"THE COURT: So noted.  I'm happy to note that for the record.  I have no problem with that for the record.  Other than that, … is there any reason why the court should not proceed on with the sentencing?  Would you like a week or so to look at that?  I don't have a problem with that.  I want you to have your best foot forward.

"I'm looking for legal authority.  He has been found guilty, determined to be guilty by a jury.  I have adjudicated him guilty and the only reason he has not been sentenced is that you have raised this issue about his mental competency.  I don't think you are going to find a case, but I don't want you to be unable to push forward.  I will give you until Tuesday to find a case.

"[DEFENSE COUNSEL]: In all candor to the court, I did some research following the State's response.  I did not find anything that would be pinpoint on this issue.  Frankly, I have not had it happen before.  If we were to give a date, can I file a written response and come back?  I'm set to start a case … on Tuesday.  If you set me on Tuesday morning maybe I can check in there first and then come here.

"[THE STATE]: Before we make the decision to reset can I just be heard on these grounds?

"THE COURT: Yes.

"[THE STATE]: The written response that I filed to their request for Rule 11 lays out the … law that is relevant to the issue of whether or not a defendant is even entitled to an evaluation for the competency.

"THE COURT: At this stage of the sentencing?

"[THE STATE]: At any stage, period, regardless of what is happening.  It's whether or not they are entitled to the

evaluation at all. In everything that [defense counsel] has said there has been no direct statement that [Spencer] has been unable to assist his counsel or present any issues that would lead him to believe he is not able to assist counsel. The only allegation that has been made is … [Spencer] has a mental disease. The caselaw says -- and I will quote it exactly -- 'Proof of the incompetency of an accused to stand trial involves more than simply a mere showing that they have mental problems for psychological difficulties. The competency of an accused to stand trial is determined by whether at the time of the trial' -- again, now we are talking about sentencing, so replace 'trial' to 'sentencing' -- 'he has sufficient present ability to consult his attorney with a reasonable degree of rational understanding and whether he has a rational as well as factual understanding of the proceedings against him.

"Even if we take at face value that [Spencer] has bipolar schizophrenia, unless [defense counsel] is able to say definitively that there have been issues that have presented during his representation … that leads him as counsel to raise a question as to whether or not [Spencer] has a rational and factual understanding of the proceedings against him and has presented some difficulties in assisting [defense counsel] in preparing for this sentencing hearing, then that Rule 11 evaluation should not be granted. There has been no representation of that; just that I have discovered that he has a mental disease.

"THE COURT: I think you are probably 100 percent correct in your argument. I don't think [defense counsel] is going to find caselaw to the contrary. [Defense counsel], your response is due by Tuesday. At that point in time, if I think we need oral argument I will set it down."

(Supp. R. 10-17.) There is no indication in the record that defense counsel

ever provided the trial court with any caselaw or other legal authority.

37

The trial court held the sentencing hearing on October 13, 2022, and, before sentencing Spencer, allowed defense counsel to make a final argument regarding the request for a mental-competency examination. Defense counsel argued that he had "proceeded to trial in the face of significant information that may call a rational understanding of the defendant into question," and he disagreed with the State's argument that the trial court was not "authorized … to entertain a mental evaluation at this time." (R. 577.) The trial court then asked defense counsel how the sentencing hearing would be affected by "information that … perhaps is out there" regarding Spencer's mental competency (R. 581), and counsel replied that "it might impact the [court's] ruling on whether or not [Spencer] is to be housed at a certain type of facility." (R. 582.) After the trial court stated that it had "no control over that," defense counsel stated:

> "All I'm saying is, I am merely offering it for the court's discretion and information as well as preservation of the record. I do think that as to the specific question of whether or not it could be reviewed at the sentencing phase, I believe that there is no actual authority for preclusion."

38

(Id.) The trial court then proceeded to sentence Spencer and, at the conclusion of the hearing, granted defense counsel's "motion for a mental evaluation … in the other cases." (R. 594.)

As noted, Spencer argues that "reasonable grounds existed to doubt [his] competency to proceed with sentencing," which, he says, required the trial court to order "a mental evaluation … prior to sentencing, and to order a competency hearing if necessary." Initially, we conclude that this issue was not preserved for appellate review.

It is well settled that, to preserve an issue for appellate review, the issue must be specifically presented to the trial court. Collier v. State, 293 So. 3d 961, 965 (Ala. Crim. App. 2019). "'"The purpose of requiring a specific objection to preserve an issue for appellate review is to put the trial judge on notice of the alleged error,"'" thereby giving that court an opportunity to correct the alleged error at trial. Id. (quoting Ex parte Coulliette, 857 So.2d 793, 795 (Ala. 2003), quoting in turn Ex parte Works, 640 So.2d 1056, 1058 (Ala. 1994)). Thus, a trial court will not be held in error on grounds not assigned at trial, Downey v. State, 370 So. 3d 626, 634 (Ala. Crim. App. 2022), and it is the objecting party's duty to provide the court with an objection specific enough to ensure that the

court understands exactly what it is being asked to do. See Thomas v. State, 142 So. 3d 1264, 1268 (Ala. Crim. App. 2013) (noting that an objection "must be specific enough to put the trial court on notice of any alleged error" (citation omitted)). Of course, "'magic words' are not required" to preserve an issue for appellate review, but it must be "clear from the record that the trial court was aware of the basis of the objection." Nash v. State, 229 So. 3d 1112, 1114 (Ala. Crim. App. 2017).

As evidenced by the foregoing procedural history, defense counsel made extensive arguments to the trial court regarding the need for a mental-competency examination for Spencer. However, nowhere in those arguments or in his written motion did defense counsel ever argue that Spencer was not mentally competent to proceed with the sentencing hearing. Rather, although defense counsel's arguments are far from a model of clarity, it appears that counsel attempted to raise a belated argument that Spencer was entitled to a mental examination to determine whether he had been competent to stand trial and/or to determine his mental state at the time of the offenses. In fact, at the August 15, 2022, hearing, the trial court expressly stated that it "[did not] know with regard to the two cases Spencer has been convicted on

40

that [his mental competency] is an issue," that it "th[ought] [defense counsel] [was] referring to the cases that are yet to come," and that it "could proceed on and sentence [Spencer]" at that time for his pharmacy-robbery and first-degree-robbery convictions, and the court asked defense counsel to "correct [the court] if [it was] wrong." It is clear, then, that the trial court did not believe defense counsel was challenging Spencer's mental competency to proceed with the sentencing hearing, and counsel did not attempt to correct the court's belief at that time, despite being given an express opportunity to do so, or at any subsequent time. Thus, we conclude that this issue was not preserved for appellate review. To hold otherwise would be to hold the trial court in error for an issue that the court clearly did not believe had been presented to it, and it was Spencer's duty to ensure that the trial court understood the nature of his request.

Moreover, even if it can be said that Spencer raised this claim below, we find it to be without merit. Rule 11.1, Ala. R. Crim. P., states:

> "A defendant is mentally incompetent to stand trial or to be sentenced for an offense if that defendant lacks sufficient present ability to assist in his or her defense by consulting with counsel with a reasonable degree of rational understanding of the facts and the legal proceedings against the defendant."

41

Rule 11.2, Ala. R. Crim. P., provides that a defendant may petition the trial court for a mental evaluation to assist the court in determining whether he has the "present mental condition and competency" to stand trial or to be sentenced. However,

> "'"[a] defendant does not have a right to a mental examination whenever he requests one, and, absent such a right, the trial court is the screening agent of such requests. Robinson v. State, 428 So. 2d 167 (Ala. Cr. App. 1982); Beauregard v. State, 372 So. 2d 37 (Ala. Cr. App.), cert. denied, 372 So. 2d 44 (Ala. 1979). The defendant bears the burden of persuading the court that a reasonable and bona fide doubt exists as to the defendant's mental competency, and this is a matter within the discretion of the trial court. Miles v. State, 408 So. 2d 158 (Ala. Cr. App. 1981), cert. denied, 408 So. 2d 163 (Ala. 1982). In determining whether an investigation into the defendant's [competency] is required, the trial court must determine if any factual data establish a reasonable ground to doubt the defendant's [competency]. Beauregard, 372 So. 2d at 43. Where the trial court finds that the evidence presents no reasonable grounds to doubt the defendant's [competency], the standard of appellate review is whether the trial court abused its discretion. Id."'"

Harrison v. State, 905 So. 2d 858, 861 (Ala. Crim. App. 2005) (quoting Ingram v. State, 779 So. 2d 1225, 1270-71 (Ala. Crim. App. 1999), quoting in turn Cliff v. State, 518 So. 2d 786, 790 (Ala. Crim. App. 1987)).

> "'"In the absence of any evidence, the mere allegations by counsel that the defendant is incompetent to stand trial do not establish reasonable grounds to doubt the defendant's

42

sanity and warrant an inquiry into his competency."' [Tankersley v. State, 724 So. 2d 557, 565 (Ala. Crim. App. 1998)], quoting Cliff [v. State], 518 So. 2d [786,] 791 [(Ala. Crim. App. 1987)].

"'"[N]ot every manifestation of mental illness demonstrates incompetence to stand trial; rather, the evidence must indicate a present inability to assist counsel or understand the charges." [Card v. Singletary, 981 F.2d 481] at 487-88 [(11th Cir. 1992)] (quoting United States ex rel. Foster v. DeRobertis, 741 F.2d 1007, 1012 (7th Cir.), cert. denied, 469 U.S. 1193, 105 S. Ct. 972, 83 L. Ed. 2d 975 (1985)). Similarly, neither low intelligence, mental deficiency, nor bizarre, volatile, and irrational behavior can be equated with mental incompetence to stand trial. McCune v. Estelle, 534 F.2d 611, 612 (5th Cir. 1976). The fact that a defendant has been treated with anti-psychotic drugs does not per se render him incompetent to stand trial. Fallada [v. Dugger], 819 F.2d [1564] at 1569 [(11th Cir. 1987)].'

"Medina v. Singletary, 59 F.3d 1095, 1107 (11th Cir. 1995)."

Hodges v. State, 926 So. 2d 1060, 1068-69 (Ala. Crim. App. 2005).

At no point during the proceedings below did defense counsel ever allege, much less present evidence indicating, that Spencer "'lack[ed] sufficient present ability to assist in his … defense'" at the sentencing hearing. Hodges, 926 So. 2d at 1068 (quoting Rule 11.1, Ala. R. Crim. P.). Instead, defense counsel merely alleged that, following the trial, he had learned that Spencer was "being treated and receiving prescription

medication for a serious mental illness," and the presentence investigative report merely notes that Spencer has been "diagnosed/treated … for bipolar disorder, depression/anxiety, and PTSD" and that his medications at that time included "Remeron (for treatment of mood conditions/bipolar issues/depression)." (Supp. C. 28.) However, the mere fact that Spencer has been diagnosed with mental illness, without more, was not a sufficient basis upon which to question his mental competency to proceed with the sentencing hearing. Hodges, 926 So. 2d at 1069. See also State v. Glass, 375 So. 2d 151, 157 (Ala. Crim. App. 2022) ("[T]he law is clear that [p]roof of the incompetency of an accused to stand trial [or to be sentenced] involves more than simply showing that the accused has mental problems or psychological difficulties." (citation omitted)).

In short, there was no evidence (or even an allegation) indicating that Spencer lacked the mental competency to proceed with the sentencing hearing. We also note that the trial court was able to observe Spencer's behavior during the sentencing hearing, where he made an articulate statement in which he accepted responsibility for his actions. (R. 590-92.) Thus, in the absence of any evidence indicating that Spencer

44

lacked the mental competency to proceed with the sentencing hearing, there was no reason for the trial court to order a mental examination or to conduct any competency proceedings. Accordingly, even if this claim had been preserved for appellate review, it does not entitle Spencer to relief. See Harrison, 905 So. 2d at 862 (holding that the trial court did not err by denying the defendant's request for a psychiatric evaluation because the evidence indicated only that he had a mental disability and that "he needed help understanding business and legal affairs," which was "not sufficient to raise a bona fide doubt as to his competency"); and Grider v. State, 766 So. 2d 189, 192 (Ala. Crim. App. 1999) (holding that "the trial court did not err in determining that there was no reasonable basis shown for questioning or examining the defendant's competency" because he had "produced no evidence that a mental illness rendered him legally incompetent to assist in his defense or to understand the nature of the charges against him").

We acknowledge Spencer's allegation that the trial court "did not allow [him] an opportunity to present testimony or 'reports of psychologists or psychiatrists' to support a claim for a competency hearing." (Spencer's brief, p. 37.) That allegation is simply not true. The

record contains no indication whatsoever that the trial court prohibited Spencer from presenting evidence regarding his mental competency. To the contrary, at the October 6, 2022, hearing, the trial court noted that it had continued the sentencing hearing to allow defense counsel an opportunity to "make an inquiry into certain matters regarding the mental status of Spencer," and the court asked counsel if he had "gotten the report back," which clearly reflects the court's willingness to consider evidence regarding Spencer's mental competency. However, defense counsel informed the trial court that he did not have any such evidence to present.

We also acknowledge Spencer's argument that the "factual issue of whether reasonable grounds existed to doubt [his] competency to proceed with sentencing ... is one for the trial court in the first instance," and, according to Spencer, the court did not make that factual finding in this case. (Spencer's brief, p. 38.) However, at the October 6, 2022, hearing, the State argued that defense counsel had failed even to allege that Spencer lacked the mental competency to proceed with the sentencing hearing, much less present evidence to that effect, and the trial court noted that the State was "probably 100 percent correct," which can be

interpreted as the factual finding that Spencer argues the court was required to make. Furthermore, to the extent that the trial court did not make that factual finding, that omission is the result of defense counsel's failure to challenge Spencer's mental competency to proceed with the sentencing hearing.

### Conclusion

Spencer's convictions for first-degree robbery and pharmacy robbery violate the Double Jeopardy Clause because, given the specific facts of this case, the former is a lesser-included offense of the latter. Thus, we remand the case with instructions for the trial court to vacate Spencer's first-degree-robbery conviction and accompanying sentence. Spencer has not presented this Court with any basis for reversing his pharmacy-robbery conviction or his sentence for that conviction, so that conviction and sentence are affirmed. The trial court shall take all necessary steps to ensure that the return to remand is filed within 28 days of the date of this opinion.

AFFIRMED IN PART; REVERSED IN PART; AND REMANDED WITH INSTRUCTIONS.

Windom, P.J., and Cole and Minor, JJ., concur.  Kellum, J., concurs in the result.